RENDERED: FEBRUARY 16, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0329-TG
(2022-CA-0906)

DANIEL CAMERON, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF
KENTUCKY

APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MITCHELL PERRY, JUDGE
V.                                      NO. 22-CI-003225

EMW WOMEN'S SURGICAL
CENTER, P.S.C., ON BEHALF OF
ITSELF, ITS STAFF, AND ITS
PATIENTS; ERNEST MARSHALL, M.D.,
ON BEHALF OF HIMSELF AND HIS
PATIENTS; PLANNED PARENTHOOD
GREAT NORTHWEST, HAWAI'I,
ALASKA, INDIANA AND KENTUCKY,
INC., ON BEHALF OF ITSELF, ITS STAFF,
AND ITS PATIENTS

APPELLEES

## OPINION OF THE COURT BY JUSTICE LAMBERT

## AFFIRMING AND REMANDING

EMW Women's Surgical Center, P.S.C. (EMW); Dr. Ernest Marshall (Dr. Marshall); and Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, and Kentucky, Inc. (Planned Parenthood Louisville) (collectively, the abortion providers) filed for injunctive and declaratory relief against two statutes that effectively prohibit abortions in Kentucky except in limited circumstances where it is necessary to preserve the life of the mother. Following a hearing,

the Jefferson Circuit Court granted an injunction against the statutes, which prevented Attorney General Daniel Cameron (Attorney General) from enforcing the statutes pending a trial on the merits. After the injunction was entered, the Attorney General filed for emergency and interlocutory relief with the Court of Appeals. The Court of Appeals granted the Attorney General's motion for emergency relief thereby dissolving the circuit court's temporary injunction. The Court of Appeals then recommended that the Attorney General's claim for injunctive relief be transferred to this Court, which we accepted.

After thorough review, we hold that the abortion providers lack third-party standing to challenge the statutes on behalf of their patients. Notwithstanding, the abortion providers have first-party, constitutional standing[1] to challenge one of the statutes on their own behalf. We affirm the Court of Appeals' holding that the circuit court abused its discretion by granting the abortion providers' motion for a temporary injunction and remand to the circuit court for further proceedings consistent with this opinion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The statutes at issue in the underlying litigation are KRS[2] 311.772 (the trigger ban) and KRS 311.7707-11 (the heartbeat ban).

The trigger ban prohibits anyone from knowingly "[administering] to, [prescribing] for, [procuring] for, or [selling] to any pregnant woman any

---

[1] Throughout this opinion, "first-party standing" and "constitutional standing" are used interchangeably.

[2] Kentucky Revised Statute.

2

medicine, drug, or other substance with the specific intent of causing or abetting the termination of the life of an unborn human being[,]"[3] and from knowingly "[using] or [employing] any instrument or procedure upon a pregnant woman with the specific intent of causing or abetting the termination of the life of an unborn human being[.]"[4]

The trigger ban contains two exceptions. The first is if a licensed physician, in his or her reasonable medical judgment, deems an abortion necessary to "prevent the death or substantial risk of death due to a physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of a pregnant woman."[5] However, the physician is mandated to make "reasonable medical efforts under the circumstances to preserve both the life of the mother and the life of the unborn human being in a manner consistent with reasonable medical practice[.]"[6] The second exception is if medical treatment rendered by a licensed physician "results in the accidental or unintentional injury or death to the unborn human being."[7]

---

[3] KRS 311.772(3)(a)1.

[4] KRS 311.772(3)(a)2. The trigger ban defines "unborn human being" as "an individual living member of the species homo sapiens throughout the entire embryonic and fetal stages of the unborn child from fertilization to full gestation and childbirth." KRS 311.772(1)(c).

[5] KRS 311.772(4)(a).

[6] *Id.*

[7] KRS 311.772(4)(b).

Under the trigger ban, there are no civil or criminal penalties imposed upon a woman who receives an abortion in violation of the statute.[8]  However, any other person who violates the statute "shall be guilty of a Class D felony,"[9] punishable by one to five years' imprisonment.[10]

The trigger ban was enacted in 2019 but was not enforceable until either the United States Supreme Court reversed *Roe v. Wade*,[11] or the United States Constitution was amended to restore the authority to regulate abortions back to the individual states.[12]  On June 24, 2022, the U.S. Supreme Court overruled *Roe v. Wade* in *Dobbs v. Jackson Women's Health Organization*,[13] triggering the statute's enforcement provision.

The heartbeat ban declares that a fetal heartbeat "has become a key medical predictor that an unborn human individual will reach live birth."[14] Accordingly, any person wishing to perform or induce an abortion must first determine "whether there is a detectible fetal heartbeat of the unborn human individual the woman is carrying."[15]  Generally, fetal cardiac activity is detectable around six weeks post-conception.  The heartbeat ban prohibits any

---

[8] KRS 311.772(5) ("Nothing in this section may be construed to subject the pregnant mother upon whom any abortion is performed or attempted to any criminal conviction and penalty.").

[9] KRS 311.772(3)(b).

[10] KRS 532.060(2)(d).

[11] 410 U.S. 133 (1973).

[12] KRS 311.772(2)(a)-(b).

[13] 213 L. Ed. 2d 545, 142 S. Ct. 2228 (2022).

[14] KRS 311.7702(5).

[15] KRS 311.7704(1)(a).  *See also* KRS 311.7705(1).

person from "intentionally [performing] or [inducing] an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the unborn human individual the pregnant woman is carrying and whose fetal heartbeat has been detected[.]"[16]

Under the heartbeat ban, a physician is only permitted to perform or induce an abortion prior to determining that a fetal heartbeat is present if the physician believes that a "medical emergency" exists that prevents compliance with the requirement of determining the existence of a heartbeat.[17]  And, a physician may only terminate a pregnancy after establishing the existence of a heartbeat if the physician "performs a medical procedure that, in the physician's reasonable medical judgment, is designed or intended to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman."[18]  The only other exception to the heartbeat ban is ectopic pregnancies.[19]

---

[16] KRS 311.7706(1).  An "unborn human individual" is defined as "an individual organism of the species homo sapiens from fertilization until live birth."  KRS 311.7701(16), KRS 311.781(9).

[17] KRS 311.7705(2)(a).  A "medical emergency" is "a condition that in the physician's reasonable medical judgment, based upon the facts known to the physician at that time, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create[.]"  *See* KRS 311.7701(10), KRS 311.781(3).

[18] KRS 311.7706(2)(a).

[19] KRS 311.7703 ("KRS 311.7704, 311.7705, and 311.7706 apply only to intrauterine pregnancies.").

As with the trigger ban, a woman upon whom an abortion is performed in violation of the heartbeat ban is subject to neither criminal nor civil penalties.[20] But violation of the heartbeat ban by any other individual is a Class D felony.[21] The statutes further provide that a woman upon whom an abortion is performed or induced in violation of the heartbeat ban "may file a civil action for the wrongful death of her unborn child" against the person who performed or induced the abortion.[22]

Neither the trigger ban nor the heartbeat ban contains an exception for rape, incest, or severe fetal abnormalities.

On June 27, 2022, EMW, Dr. Marshall, and Planned Parenthood Louisville filed a complaint in Jefferson Circuit Court against the Attorney General[23] seeking injunctive and declaratory relief from the enforcement of the trigger ban and the heartbeat ban.[24] EMW is a Louisville-based corporation that is licensed to provide abortion services. Dr. Marshall is a board-certified obstetrician-gynecologist (OBGYN) who owns EMW and provides abortion services to EMW patients. Planned Parenthood Louisville is a nonprofit

---

[20] KRS 311.7705(4), KRS 311.7706(4).

[21] KRS 311.990(21)-(22).

[22] KRS 311.7709(2).

[23] The complaint also named several other Kentucky officials in their official capacity, specifically the Secretary of the Cabinet for Health and Family Services, the Executive Director of the Kentucky Board of Medical Licensure, and the Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky. However, the Attorney General is the only defendant before us in this appeal.

[24] Left unchallenged was another Kentucky abortion statute, KRS 311.782, which prohibits abortions "when the probable gestational age of the unborn child is fifteen (15) weeks or greater."

organization that operates two health centers in Kentucky; its Louisville center provides abortion services.

Prior to the U.S. Supreme Court ruling in *Dobbs*, EMW and Planned Parenthood Louisville provided abortion inducing medication up to ten weeks after a patient's last missed period. EMW also provided elective procedural abortions up to twenty-one weeks and six days after a patient's last missed period, and Louisville Planned Parenthood provided elective procedural abortions up to thirteen weeks and six days after a patient's last missed period. The abortion providers' complaint alleged that "[t]he threat of criminal penalties from the Trigger Ban has forced [them] to cancel the appointments of patients seeking this time-sensitive care," and that "in the near future, when the federal court lifts the injunction currently preventing enforcement of [the heartbeat ban],[25] the threat of additional criminal penalties from that Ban will similarly force [them] to turn away patients seeking an abortion at or after approximately six weeks, even if the Trigger Ban is enjoined."

Each of the abortion providers stated in their complaint that they were challenging the bans on behalf of themselves and their patients, but no individual patient was named as a plaintiff. On behalf of their patients, the

---

[25] According to the complaint, before *Dobbs* was issued, EMW and Dr. Marshall were granted a temporary restraining order against the enforcement of the heartbeat ban in the Western District of Kentucky. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 3:19-CV-178-DJH, 2019 WL 1233575 (W.D. Ky. Mar. 15, 2019). Following *Dobbs*, EMW and Dr. Marshall filed a motion to dismiss the federal case without prejudice in light of *Dobbs*. On June 30, 2022, the federal injunction was dissolved. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178-DJH (W.D. Ky. June 30, 2022).

abortion providers alleged that the trigger ban and the heartbeat ban violated their patients' right to privacy as guaranteed by Sections 1 and 2 of the Kentucky Constitution and their patients' right to self-determination as guaranteed by Sections 1 and 2 of the Kentucky Constitution.

Unspecific to their patients' rights, the abortion providers alleged that the trigger ban: improperly delegated the power of the General Assembly to define the scope of Kentucky criminal law in violation of Sections 27, 28, and 29 of the Kentucky Constitution; took effect upon the authority of the U.S. Supreme Court instead of the General Assembly in violation of Section 60 of the Kentucky Constitution; violated the abortion providers' right to due process as guaranteed by Section 2 of the Kentucky Constitution by imposing serious criminal penalties while failing to give them fair notice of when it took effect; and was constitutionally unintelligible in violation of Sections 27, 28, and 29 of the Kentucky Constitution by failing to intelligibly define the point at which the ban would become enforceable. The abortion providers made no arguments against the heartbeat ban in relation to their own constitutional rights.

On June 30, 2022, three days after the complaint was filed, the circuit court issued a temporary restraining order against the enforcement of the trigger ban and the heartbeat ban at the behest of the abortion providers. Thereafter, on July 6, the circuit court held a hearing on the request for a temporary injunction. The court heard testimony from two witnesses proffered by the abortion providers and two witnesses for the Attorney General.

8

On July 22, the circuit court entered an opinion and order granting the temporary injunction. The circuit court first addressed whether the abortion providers had the requisite standing to bring their asserted claims. Regarding whether the abortion providers had first-party, constitutional standing to assert their own rights in challenging the bans the circuit court ruled:

> Kentucky courts have "the constitutional duty to ascertain the issue of constitutional standing . . . to ensure that only justiciable causes proceed in court." *Commonwealth, Cabinet for Health & Fam. Servs., Dep't for Medicaid Servs. v. Sexton by & through Appalachian Reg'l Healthcare, Inc.*, 566 S.W.3d 185, 192 (Ky. 2018) . . . In *Sexton*, the Kentucky Supreme Court adopted the federal standard for standing as set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), holding that "for a party to sue in Kentucky, the initiating party must have the requisite constitutional standing to do so, defined by three requirements: (1) injury, (2) causation, (3) redressability. In other words, [a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. *Sexton*, 566 S.W.3d at 196.

> [. . .]

> The challenged statutes directly prohibit the Plaintiffs from lawfully engaging in both medication and procedural abortions. The Attorney General is attempting to enforce these statutes against the Plaintiffs. An order of this Court preventing enforcement of these statutes would provide the Plaintiffs with adequate relief. Therefore, the Plaintiffs have satisfactorily established all the required elements of standing and can proceed with this suit.

Concerning whether the abortion providers had third-party standing to challenge the bans by asserting violations of its patients' rights, the circuit court found:

> [t]he Attorney General claims the Plaintiffs lack the standing to bring this suit because the facilities do not have third party standing to represent the rights of their patients. However, the Court finds that the Plaintiffs do have standing to proceed with

9

this suit.  While not binding, since Kentucky adopted the federal standing guidelines, federal cases provide persuasive authority. Federal courts have long allowed for third party standing in situations where "enforcement of the challenged restriction against the litigation would result indirectly in the violation of third parties' rights."  *Warth v. Seldin*, 422 U.S. 490, 510 (1975).  Third party standing should be allowed when: "(1) the interests of the litigant and the third party are aligned, and (2) there is an obstacle to the third party asserting her own rights."  *Singleton v. Wulff*, 428 U.S. 106, 114-18 (1976).

Recently, the Supreme Court reaffirmed the practicality of third party standing for abortion providers in *June Medical Services, LLC v. Russo*, 140 S.Ct. 2103, 2118 (2020).  The Supreme Court concluded that abortion providers had third party standing to assert claims on behalf of their patients because the challenged laws regulated their conduct, including by threat of sanctions, the providers had every incentive to resist efforts at restricting their operations, and the providers were far better positioned than their patients to challenge the restrictions.  *Id.* at 2119.

The circuit court further discussed the Attorney General's contention that "the United States Supreme Court undermined third-party standing in *Dobbs* to the point it can no longer be relied upon."  The circuit court dismissed this argument finding that "[w]hile the United States Supreme Court expressed displeasure with how abortion related litigation had proceeded with the doctrine of third-party standing, this comment came in dicta, and is therefore not binding upon this Court."  Consequently, the circuit court ruled that the abortion providers also had third-party standing to challenge the bans on behalf of their patients.

With standing established, the circuit court went on to address the aptness of granting a temporary injunction.  In accordance with Kentucky's well-established standard for demonstrating entitlement to an injunction, a

10

party seeking an injunction must show: (1) that irreparable injury is probable if injunctive relief is not granted; (2) that the equities—including the public interest, harm to the defendant, and preservation of the status quo—weigh in favor of the injunction; and (3) that there is a serious question warranting trial on the merits.[26]

On the first prong, injury, the circuit court noted that from the date *Dobbs* was rendered to the date that the temporary restraining order was entered in this case, EMW turned away almost 200 patients with previously scheduled appointments. Further, an OBGYN who was a witness for the abortion providers testified that the risks presented by abortions increase the later in the pregnancy that the procedure is performed, and therefore any delay in scheduling and performing an abortion comes with increased risk. Finally, the court found that waiting until final judgment on the issues presented in this case, absent injunctive relief, would be effectively meaningless to many women because they would either be past gestational time restrictions or would be forced to carry their pregnancy to term.

Concerning the second prong, a weighing of the equities, the court first found that abortion is a form of healthcare, and that the denial of healthcare is detrimental to the public interest. Additionally, the abortion providers' second witness, an expert in economics and policy evaluation, testified that abortion bans disproportionately affect the poor and disadvantaged members of society,

---

[26] *Maupin v. Stansbury,* 575 S.W.2d 695, 699 (Ky. App. 1978).

11

and can inflict serious financial, educational, and professional burdens on women and their families. The circuit court further ruled that, at most, the only harm to the Commonwealth that would result from injunction would be delayed enforcement. Finally, it found that providing injunctive relief would simply restore the status quo that existed in the Commonwealth for nearly fifty years between the issuance of *Roe v. Wade* and *Dobbs*.

The circuit court also found that the abortion providers demonstrated serious questions warranting a trial on the merits. The court ruled that the trigger ban was an unconstitutional delegation of legislative power violative of Sections 27, 28, and 29 of the Kentucky Constitution, and that it was unconstitutionally vague because the date upon which it became effective was unclear. The court further determined that the heartbeat ban violated the right to privacy and right to self-determination under Sections 1 and 2 of the Kentucky Constitution, and, *sua sponte*, ruled that the heartbeat ban violated the right to equal protection under Sections 1, 2, and 3 of the Kentucky Constitution as well as the right to religious freedom under Section 5 of the Kentucky Constitution.

Based on its rulings, the circuit court lifted the temporary restraining order against the bans and entered a temporary injunction. After the temporary injunction was in place, the Attorney General filed a motion for emergency relief pursuant to RAP[27] 20(D)[28] in the Court of Appeals. Under RAP

---

[27] Kentucky Rule of Appellate Procedure.

[28] Formerly Kentucky Rule of Civil Procedure (CR) 65.07(6).

12

20(B)[29] a party adversely affected by the entry of a temporary injunction may file a motion for relief from that order within twenty days of its entry. And, "[i]f a movant will suffer irreparable injury before a motion under [RAP 20(B) or (C)] will be considered by a panel of the Court of Appeals, the movant may request emergency relief[.]"[30] The Court of Appeals, acting through one judge on the *ex parte* emergency motion, held that the Attorney General made the required showings for relief. It reasoned that, as the statutes were duly enacted, they carried a presumption of constitutionality and that any abortions performed while the constitutionality of the statutes was addressed on the merits could not be undone.

In granting the Attorney General's motion for emergency relief, the Court of Appeals dissolved the circuit court's temporary injunction against the bans. The Attorney General's motion for interlocutory relief under RAP 20 was then set to be assigned to a three judge Court of Appeals panel. Before a three-judge panel could address the Attorney General's motion for interlocutory relief, the abortion providers filed for emergency relief from the Court of Appeals' initial ruling in this Court under RAP 20(F)[31]. This Court denied the abortion providers' emergency motion, as it found no "extraordinary cause"[32]

---

[29] Formerly CR 65.07(1).

[30] RAP 20(D), formerly CR 65.07(6).

[31] Formerly CR 65.09(3).

[32] RAP 20(F)(1) ("Such a motion will be entertained only for extraordinary cause shown in the motion.").

13

warranting immediate review.[33]  However, after the abortion providers filed

their motion for emergency relief, the Court of Appeals recommended that the

Attorney General's motion for interlocutory relief be transferred to this Court

for adjudication in the first instance.[34]  We accepted transfer.[35]  Accordingly,

the issue now before us is whether the circuit court erred by issuing a

temporary injunction against the trigger ban and the heartbeat ban.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

### A. Standing[36]

We begin by addressing whether the abortion providers have the

requisite standing to challenge the bans.  We review issues of standing *de

novo*,[37] affording no deference to the circuit court's ruling.[38]

---

[33] *EMW Women's Surgical Ctr., P.S.C. v. Cameron*, 2022-SC-0326-I, 2022 WL 3641196, at *1 (Ky. Aug. 18, 2022).

[34] *Id.*

[35] *Id.*

[36] The issue of standing is properly before us.  This Court recently held that, while a circuit court's ruling on standing does not itself give rise to the right of interlocutory relief, this "should not constrain the power of the appellate court . . . from inquiring into whether a plaintiff has the requisite standing to sue when an interlocutory appeal is properly before an appellate court on an issue recognized as immediately appealable."  *Sexton*, 566 S.W.3d at 191.  *See also, Overstreet v. Mayberry*, 603 S.W.3d 244, 251 (Ky. 2020) (holding that this Court may properly address constitutional standing in an interlocutory appeal that is properly before it on independent grounds).  Here, the circuit court's issuance of a temporary injunction was immediately appealable in accordance with RAP 20(B).  The abortion providers' standing may therefore be addressed herein.

[37] *Overstreet*, 603 S.W.3d at 252.

[38] *See, e.g.*, *Marshall v. Ky. Farm Bureau Mut. Ins. Co.*, 618 S.W.3d 499, 502 (Ky. App. 2020).

14

Without question, one of the most important and fundamental principles that endures in this country's particular form of government is the separation of powers amongst the legislative, judicial, and executive branches. The U.S. Supreme Court has accordingly interpreted the U.S. Constitution as providing a "series of limits on the federal judicial power."[39] One such limit is Article III of the U.S. Constitution's directive that federal courts may only consider "cases and controversies."[40] The U.S. Supreme Court has identified five major justiciability doctrines to ensure that only cases and controversies are considered by the federal judiciary.[41] Those doctrines are: the prohibition against rendering advisory opinions, ripeness, mootness, the political question doctrine, and—most significant for our purposes—standing.[42] "As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of [a court's] jurisdiction and to justify exercise of the court's remedial powers on his behalf."[43] Indeed, this Court considers standing to be such a fundamental requirement that we have previously directed that "all Kentucky courts have the constitutional duty to ascertain the issue of constitutional

---

[39] *Sexton*, 566 S.W.3d at 192-93 (quoting Edwin Chemerinsky, *Constitutional Law*, 40 (Vicki Been et al. eds., 5th ed. 2013)).

[40] *See* U.S. Const. Art. III, §2.

[41] *Sexton*, 566 S.W.3d at 193.

[42] *Id.*

[43] *Warth*, 422 U.S. at 498–99 (internal citations omitted).

15

standing, acting on their own motion, to ensure that only justiciable causes proceed in court[.]"[44]

In *Sexton*, this Court held that Section 112(5) of the Kentucky Constitution which vests "original jurisdiction of all *justiciable causes* not vested in some other court" in Kentucky's circuit courts was a sufficient parallel to the "cases and controversies" language of the U.S. Constitution to adopt the federal constitutional standing doctrine espoused in *Lujan*.[45] Consequently, unless standing is statutorily conferred, "for a party to sue in Kentucky, the initiating party must have the requisite constitutional standing to do so, defined by three requirements: (1) injury, (2) causation, and (3) redressability."[46]

> In addition to these federal constitutional requirements, two major federal prudential standing principles exist: (1) a party generally may assert only his or her own rights and cannot raise the claims of third parties not before the court, i.e., the prohibition against third-party standing; and (2) a plaintiff may not sue as a taxpayer who shares a grievance in common with all other taxpayers, i.e., the prohibition against generalized grievances.[47]

In contrast to first-party, constitutional standing, the prohibition against third-party standing is a prudential doctrine, meaning it is "a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies

---

[44] *Sexton*, 566 S.W.3d at 192.

[45] *Id.* at 195.

[46] *Id.* at 196.

[47] *Id.* at 193 (internal quotation marks omitted).

where the applicable constitutional questions are ill-defined and speculative."[48]

As noted, the doctrine against third-party standing "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."[49]

> This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation. It represents a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the courts might be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights[.][50]

Federal case law provides a limited exception to the general rule that "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."[51] To qualify for the exception, a litigant bears the burden of proving that

> three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, [*Singleton*, 428 U.S. at 112, 96 S.Ct. at 2873]; the litigant must have a close relation to the third party, *id.*, at 113–114, 96 S.Ct., at 2873–2874; and there must exist some hindrance to the third

---

[48] *Craig v. Boren*, 429 U.S. 190 (1976) (citing *Barrows v. Jackson*, 346 U.S. 249, 255, 257 (1953); *Singleton*, 428 U.S. at 123-124 (Powell, J., dissenting)).

[49] *Warth*, 422 U.S. at 509. *See also Associated Indus. of Ky. v. Commonwealth*, 912 S.W.2d 947, 951 (Ky. 1995) ("Ordinarily, a litigant may only assert his own constitutional rights or immunities . . . The assertion of one's own legal rights and interests must be demonstrated and the claim to relief will not rest upon the legal rights of third persons.").

[50] *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

[51] *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (holding a criminal defendant has third-party standing to raise the equal protection rights of a juror excluded from service by the prosecution on the basis of the juror's race).

17

party's ability to protect his or her own interests. *Id.*, at 115–116, 96 S.Ct., at 2874–2875.[52]

This limited exception to the general prohibition against third-party standing is sometimes referred to as the *jus tertii* doctrine.

This Court has previously invoked the general prohibition against third-party standing to prevent a litigant from leveling a constitutional challenge against a state statute on behalf of a third-party.[53] However, to date, the issue of whether to recognize the federal *jus tertii* exception has not been placed so squarely before us. For the reasons that follow, we hereby answer that question affirmatively and adopt the *jus tertii* exception as our own.

In general, the case law of this Commonwealth in the area of third-party standing is scarce. This Court has rejected a would-be litigant's third-party standing to challenge a state statute in but two cases: *Associated Industries* and *Bradley*.

In *Associated Industries*, this Court held that a state-wide association of employers of lobbyists did not have third-party standing to challenge newly enacted lobbying regulations on behalf of its employees.[54] The *Associated Industries* Court did not discuss standing at length and did not address whether the *jus tertii* exception was applicable.[55] Significantly though, the

---

[52] *Id.* at 410-11.

[53] *Bradley v. Commonwealth ex rel. Cameron*, 653 S.W.3d 870, 880 (Ky. 2022); *Associated Industries*, 912 S.W.2d at 951.

[54] *Id.*

[55] *See id.*

18

Court relied upon *Warth v. Seldin*, a U.S. Supreme Court case, to support its holding that "[t]he assertion of one's own legal rights and interests must be demonstrated and the claim to relief will not rest upon the legal rights of third persons."[56] In *Warth*, taxpayers of Rochester, New York sought to challenge a zoning ordinance of Penfield, New York, an incorporated municipality of Rochester.[57] The Rochester taxpayers alleged that Penfield's consistent refusal to build low and moderate cost housing under the ordinance forced Rochester to provide such housing which, in turn, raised Rochester's taxes.[58] The *Warth* Court ultimately rejected the Rochester taxpayers' claim to third-party standing. In doing so, it addressed each of the *jus tertii* requirements. It first held that the taxpayer's asserted injury of increased taxes was conjectural, and that the line of causation between Penfield's actions and said injury was not apparent from the taxpayer's complaint.[59] It then went on to hold that

> no relationship, other than an incidental congruity of interest, is alleged to exist between the Rochester taxpayers and persons who have been precluded from living in Penfield. Nor do the taxpayer-petitioners show that their prosecution of the suit is necessary to insure protection of the rights asserted, as there is no indication that persons who in fact have been excluded from Penfield are disabled from asserting their own right in a proper case.[60]

In our other case, *Bradley*, this Court held that the Floyd County Bar Association lacked third-party standing to challenge the elimination of a Floyd

---

[56] *Id.*

[57] *Warth*, 422 U.S. at 493-94.

[58] *Id.* at 508-09.

[59] *Id.* at 509.

[60] *Id.* at 510.

County Circuit Court division on behalf of its unspecified, third-party clients.[61]

*Bradley* also cited *Warth* and seemed to apply the genuine hinderance prong of

the *jus tertii* test: the Court found it significant that "no client or litigant with a

court date pending in [the circuit division], [had] been named as a plaintiff on

the face of Bradley's complaint. And Bradley . . . made no argument

concerning why those unspecified clients cannot sue to remedy the injuries

alleged in the complaint."[62]

Further, there are at least two specific instances in which third-party

standing is explicitly provided for in the Commonwealth, both of which are

based on U.S. Supreme Court precedent. First, we afford third-party standing

to criminal defendants to raise equal protection claims on behalf of jurors who

are excluded from service by the prosecution on the basis of race.[63] And, in

cases involving challenges to state statutes that impede upon First Amendment

rights, we permit a person to whom a statute could be constitutionally applied

to challenge the statute on the ground that it may be unconstitutionally

applied to third parties in other situations not before the Court.[64]

---

[61] *Bradley*, 653 S.W.3d at 880.

[62] *Id.*

[63] *See Roe v. Commonwealth*, 493 S.W.3d 814, 827-28 (Ky. 2015) (adopting *Powers v. Ohio*, 499 U.S. 400 (1991)) ("*Powers v. Ohio* made clear that *Batson*'s scope extends beyond the defendant's race, holding that the Fourteenth Amendment eliminates racial discrimination from all official acts and proceedings of the state in the judicial system. So following *Powers*, a criminal defendant is essentially afforded third-party standing to raise equal-protection claims for jurors the prosecution excludes because of their race.").

[64] *Martin v. Commonwealth*, 96 S.W.3d 38, 50 (Ky. 2003) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)) ("Generally, a person to whom a statute may constitutionally be applied cannot challenge it on the ground that it may conceivably

Moreover, there has been an undeniable trend by this Court in recent years in favor of following federal standing doctrines. As previously discussed, in 2018, this Court explicitly adopted the constitutional standing test established by the U.S. Supreme Court in *Lujan* in *Sexton*. And, last year in *Ward v. Westerfield* we explicitly recognized that Kentucky follows the other major federal prudential standing principle, the prohibition against generalized grievances.[65]

Given this Court's previous citation to federal case law containing the *jus tertii* exception, our allowance of third-party standing in other contexts, and our recent trend toward following federal standing principles, we can discern no reason to now reject the federal *jus tertii* test as an exception to the general prohibition against third-party standing. In addition, although we believe that *jus tertii* test will be satisfied only in exceedingly rare circumstances, we do not believe it wise to foreclose its availability altogether should those circumstances present themselves.

Accordingly, in Kentucky, for a litigant to have third-party standing to assert the constitutional rights of another in order to obtain relief for himself or

---

be applied unconstitutionally to others in other situations not before the Court. However, there is an exception with respect to statutes restricting First Amendment rights. That is because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.").

[65] 653 S.W.3d 48, 52 (Ky. 2022) ("Kentucky courts recognize the prohibition against generalized grievances. In *Sexton*, we explained that the prohibition against generalized grievances was one of 'two major federal prudential standing principles.' Even before *Sexton* both this Court and the Kentucky Court of Appeals recognized the prohibition against generalized grievances as part of our standing jurisprudence.").

21

herself, the litigant must demonstrate: (1) an injury in fact that gives the litigant a sufficiently concrete interest in the outcome of the dispute; (2) a close relationship between the litigant and the non-party individual or individuals whose rights the litigant seeks to assert; and (3) that there exists a genuine obstacle or hindrance to the possessor of the right's ability to assert his or her own interest.

With the foregoing in mind we now address, first, whether the abortion providers have first-party, constitutional standing to challenge the bans on their own behalf, and second, whether the abortion providers have third-party standing to challenge the bans on behalf of their patients.

1) **The abortion providers have first-party, constitutional standing to challenge the trigger ban but they do not have constitutional standing to challenge the heartbeat ban.**

As stated, to establish constitutional standing, a litigant bears the burden of proving injury, causation, and redressability.[66]

To establish the first element, an injury in fact, the injury alleged must be "concrete, particularized, and actual or imminent."[67] "For an injury to be particularized, it must affect the plaintiff in a personal and individual way. This means the plaintiff personally has suffered some actual or threatened injury. For an injury to be concrete, it must actually exist."[68]

---

[66] *Sexton*, 566 S.W.3d at 196.

[67] *Overstreet*, 603 S.W.3d at 252.

[68] *Id.* (internal quotation marks omitted).

The only injury that the abortion providers alleged in their complaint that was personal to them was that the threat of criminal penalties from the trigger ban forced them to turn away patients seeking abortions. This, in turn, would naturally result in the abortion providers suffering an economic detriment to their businesses. Such a financial harm is a sufficient injury for first-party standing purposes. For instance, in *Sexton*, we reasoned that the plaintiff had not suffered a sufficient injury in fact to confer constitutional standing, in part, because she had suffered no financial harm and "[was] not financially interested in any way whatsoever in the outcome of [the] dispute."[69] Here, the abortion providers have already suffered economic harm and have a financial interest in the outcome of this dispute. Their alleged injury is accordingly concrete and particularized, thus satisfying the first element of constitutional standing.

As for causation, the abortion providers argued that the trigger ban forced them to cease all abortion services, as it prohibits all abortions unless such a procedure is necessary to save the life of the mother. The injury alleged is therefore fairly traceable to the defendant's alleged unlawful conduct[70] and the causation requirement is met.

Regarding the final prong, redressability, the abortion providers made four arguments against the trigger ban that were not specific to their patients' rights, namely: that it was an unconstitutional delegation of legislative

---

[69] *Sexton*, 566 S.W.3d at 197.

[70] *Id.* at 193.

23

authority; that it became effective upon the authority of an entity other than the General Assembly; that it violated the abortion providers' right to due process by imposing criminal penalties while being unconstitutionally vague as to when it became effective; and that it was unconstitutionally unintelligible because it did not intelligibly define when it became effective.

At the outset, we hold that the abortion providers' latter two arguments are now moot. "[A] moot case is one which seeks to get a judgment . . . upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy."[71] The trigger ban states in relevant part that it "shall become effective immediately upon . . . Any decision of the U.S. Supreme Court which reverses, in whole or in part, Roe v. Wade[.]"[72] Under U.S. Supreme Court Rule 45, "[i]n a case on review from a state court, the mandate issues 25 days after entry of the judgment[.]"[73] The abortion providers argued that the trigger ban was both unconstitutionally vague and unintelligible because it did not specify whether it would become enforceable on June 24, 2022, when the U.S. Supreme Court entered the judgment in *Dobbs*, or twenty-five days later on July 19, 2022, when the mandate issued. As of the rendition of this opinion, we are now well-past both of those dates and the trigger ban would be in effect either way, assuming it withstands the challenges against it. The issues concerning when the trigger ban would go

---

[71] *See, e.g.*, *Morgan v. Getter*, 441 S.W.3d 94, 98-99 (Ky. 2014).
[72] KRS 311.772(2)(a).
[73] U.S. Sup. Ct. R. 45(2).

into effect are therefore moot and cannot support the abortion providers assertion of constitutional standing, as no redressability regarding those issues is available.

Nevertheless, the abortion providers' arguments that the trigger ban improperly delegates legislative authority and that becomes effective on the authority of an entity other than the General Assembly remain live issues. If the abortion providers were to receive a favorable ruling on those issues, the statute would be invalidated if the offending enactment provision could not be severed.[74] This in turn would provide the abortion providers with the relief they seek, satisfying the redressability prong of constitutional standing.

However, although the abortion providers have constitutional standing to challenge the trigger ban on the foregoing two grounds, they made no arguments concerning their own rights in relation to the heartbeat ban. Their only assertion against the heartbeat ban was that it violated their patients' constitutional rights to privacy and self-determination. For the reasons delineated in Part II(A)(2) of this Opinion, the abortion providers do not have third-party standing to assert the constitutional rights of their patients. They therefore have presented no arguments against the heartbeat ban that this Court can address to provide them relief leaving the redressability prong of constitutional standing unsatisfied as to the heartbeat ban.

---

[74] *See* KRS 446.090.

Accordingly, we hold that the abortion providers have first-party, constitutional standing to challenge the trigger ban, but they lack such standing to challenge the heartbeat ban.

**2) The abortion providers do not have third-party standing to challenge the trigger ban or the heartbeat ban on behalf of their patients.**

We must next determine whether the abortion providers have third-party standing to challenge the bans by asserting the constitutional rights of their patients. On that front, we reiterate that to overcome the general prohibition against third-party standing, the abortion providers bore the burden of proving that they suffered an injury in fact giving them a sufficiently concrete interest in the outcome of this dispute; that they have a close relationship with the persons who possess the right to be asserted; and that there is some hindrance or genuine obstacle to those persons asserting that right themselves.

The abortion providers argue that, prior to *Dobbs*, the U.S. Supreme Court frequently permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related state statutes. They further contend that they have a close relationship to the patients whose rights they wish to assert because their patients' ability to access abortion is inextricably bound with the abortion providers' ability to engage in the conduct prohibited under the statute. This alignment of interests, they argue, satisfies the close relationship prong. The abortion providers also argue that their patients face a genuine hindrance: the understandable fear of stigmatization if information about their choice to receive an abortion did not remain private.

26

The Attorney General argues that the abortion providers do not have third-party standing. While he acknowledges that the U.S. Supreme Court has historically implemented a special carveout in its own *jus tertii* jurisprudence in cases involving abortion providers attempting to assert the rights of their patients, he contends that practice was recently discredited by the U.S. Supreme Court in *Dobbs*. The Attorney General further argues that although the circuit court cited the proper test for determining third-party standing, it did not engage in an actual analysis of its requirements. If it had, he contends, it could not have found that the abortion providers have third-party standing. For the reasons that follow, we agree.

In *Dobbs*, the U.S. Supreme Court held that the U.S. Constitution does not contain a right to abortion and gave the ability to regulate abortions back to the individual states. In doing so, the Court considered, *inter alia*, whether *stare decisis* required continued acceptance of its abortion rights precedents *Roe v. Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey*[75]. Generally, when the U.S. Supreme Court addresses an argument of whether to follow *stare decisis*, its "test" is to address a number of factors that it considers most relevant in a given case.[76] The *Dobbs* Court held that "five factors

[75] 505 U.S. 833 (1992), *overruled by Dobbs v. Jackson Women's Health Org.*, 213 L. Ed. 2d 545, 142 S. Ct. 2228 (2022).

[76] *See, e.g.*, *Ramos v. Louisiana*, 206 L. Ed. 2d 583, 140 S. Ct. 1390, 1414 (2020) ("The stare decisis factors identified by the Court in its past cases include: the quality of the precedent's reasoning; the precedent's consistency and coherence with previous or subsequent decisions; changed law since the prior decision; changed facts since the prior decision; the workability of the precedent; the reliance interests of those who have relied on the precedent; and the age of the precedent."); *Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 201 L. Ed. 2d 924, 138 S. Ct. 2448,

[weighed] strongly in favor overruling *Roe* and *Casey*: the nature of their error, the quality of their reasoning, the 'workability' of the rules they imposed on the country, **their disruptive effect on other areas of the law**, and the absence of concrete reliance."[77]

The Court then discussed why each of the foregoing factors supported its decision to reject *stare decisis*.[78]  As to the fourth factor cited, the abortion precedents' "disruptive effect on other areas of the law," the *Dobbs* Court explained:

> *Roe* and *Casey* have led to the distortion of many important but unrelated legal doctrines, and that effect provides further support for overruling those decisions.
>
> Members of this Court have repeatedly lamented that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion.  [*Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 814, 106 S. Ct. 2169, 2206, 90 L. Ed. 2d 779 (1986) (O'Connor, J., dissenting)]; *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 785, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (Scalia, J., concurring in judgment in part and dissenting in part); [*Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 631-633, 136 S. Ct. 2292 (2016) (THOMAS, J., dissenting)]; *id.*, at 645–666, 678–684, 136 S.Ct. 2292 (ALITO, J., dissenting); *June Medical*, 591 U.S., at —— – ——, 140 S.Ct., at 2171-2179 (GORSUCH, J., dissenting).
>
> The Court's abortion cases have diluted the strict standard for facial constitutional challenges.  **They have ignored the Court's third-party standing doctrine**.  They have disregarded standard

---

2478 (2018) ("Our cases identify factors that should be taken into account in deciding whether to overrule a past decision.  Five of these are most important here: the quality of [the precedent's] reasoning, the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision.").

[77] *Dobbs*, 142 S. Ct. at 2265 (emphasis added).

[78] *Id.* at 2265-78.

*res judicata* principles.  They have flouted the ordinary rules on the severability of unconstitutional provisions, as well as the rule that statutes should be read where possible to avoid unconstitutionality.  And they have distorted First Amendment doctrines.

When vindicating a doctrinal innovation requires courts to engineer exceptions to longstanding background rules, the doctrine has failed to deliver the principled and intelligible development of the law that *stare decisis* purports to secure.[79]

In the case before us, the circuit court found that the *Dobbs* Court's statement that its "abortion cases . . . have ignored the Court's third-party standing doctrine" was merely dicta and therefore not binding.  But yet the U.S. Supreme Court clearly expressed that its abortion jurisprudence's misapplication of its third-party standing doctrine was significant enough to cite as one of the reasons why fifty years of abortion precedent should no longer be followed.  And in doing so the Court specifically acknowledged that its previous practice of granting abortion providers third-party standing on behalf of their patients to challenge state abortion statutes was a misapplication of its third-party standing doctrine.  Following its statement regarding its misapplication of third-party standing, the *Dobbs* Court cited two cases, *June Medical* and *Whole Woman's Health,* in which abortion providers were permitted to challenge a state abortion statute on behalf of their patients.[80]  This Court can therefore not so easily disregard the U.S. Supreme Court's denouncement of permitting abortion providers third-party standing in

---

[79] *Id.* at 2275-76 (internal citations, quotation marks, and footnotes omitted) (emphasis added).

[80] *Id.* at 2275 n. 61.

29

cases such as the one now before us. And, after thorough review, we respectfully agree that its rebuke was proper.

The best example of the *jus tertii* exception being improperly applied by the U.S. Supreme Court in an abortion case is *Singleton, supra.* In *Singleton*, a plurality opinion that was sharply divided on the issue of third-party standing, two Missouri-licensed physicians filed suit to challenge a Missouri statute that prevented Medicaid from paying for abortions that were not "medically indicated."[81] In addressing whether the physicians could challenge the statue on behalf of their patients who were not named in the suit, the Court first held that the close relationship prong of *jus tertii* was satisfied based on its reasoning that a woman cannot safely receive an abortion without a physician, that an indigent woman cannot easily secure an abortion without reimbursement to her physician from the state, and that a woman's physician is "intimately involved" in her abortion decision.[82] With regard to the genuine obstacle or hindrance requirement, it held:

> As to the woman's assertion of her own rights, there are several obstacles. For one thing, she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit. A second obstacle is the imminent mootness, at least in the technical sense, of any individual woman's claim. Only a few months, at the most, after the maturing of the decision to undergo an abortion, her right thereto will have been irrevocably lost, assuming, as it seems fair to assume, that unless the impecunious woman can establish Medicaid eligibility she must forgo abortion. **It is true that these obstacles are not insurmountable. Suit may be brought under a pseudonym, as so frequently has been done. A woman who**

---

[81] *Singleton*, 428 U.S. at 108.

[82] *Id*. at 117.

30

**is no longer pregnant may nonetheless retain the right to litigate the point because it is "'capable of repetition yet evading review.'"** *Roe v. Wade*, 410 U.S., at 124-125, 93 S.Ct. at 713. And it may be that a class could be assembled, whose fluid membership always included some women with live claims.[83]

Based on this contradictory reasoning, the Court held that it was "generally . . . appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision[.]"[84]

In this way, the *Singleton* plurality effectively stated that there were genuine obstacles to a woman seeking an abortion to challenge the statute herself—anonymity and imminent mootness—but then, *in the same paragraph*, acknowledged that they were not genuine obstacles at all. This glaring inconsistency was lambasted by Justice Powell in his concurring in part and dissenting in part opinion. He argued:

> on the plurality's own statement of this principle and on its own discussion of the facts, the litigation of third-party rights cannot be justified in this case. The plurality virtually concedes, as it must, that the two alleged "obstacles" to the women's assertion of their rights are chimerical. Our docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision. Nor is there basis for the "obstacle" of incipient mootness when the plurality itself quotes from the portion of *Roe v. Wade*, 410 U.S. 113, 124-125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973), that shows no such obstacle exists. In short, in light of experience which we share regularly in reviewing appeals and petitions for certiorari, the "obstacles" identified by the plurality as justifying departure from the general rule simply are not significant.[85]

---

[83] *Id.* (emphasis added).

[84] *Id.* at 118.

[85] *Id.* at 126-27 (Powell, J., dissenting).

The *Singleton* plurality's reasoning is further discredited when it is compared to a case wherein the *jus tertii* doctrine, in particular the genuine hindrance prong, was correctly applied. For example, in *Kowalski*, the Court addressed whether two defense attorneys could challenge a Michigan statute which prohibited the appointment of appellate counsel for indigent defendants who plead guilty.[86] The Court first held that the attorneys had failed to demonstrate a requisitely close relationship, as they had only alleged harm to future, hypothetical clients.[87] Next, regarding the hindrance or genuine obstacle prong, the Court said:

> The attorneys argue that, without counsel, these avenues are effectively foreclosed to indigents. They claim that unsophisticated, pro se criminal defendants could not satisfy the necessary procedural requirements, and, if they did, they would be unable to coherently advance the substance of their constitutional claim.

> That hypothesis, however, was disproved in the Michigan courts, *see, e.g.*, *People v. Jackson*, 463 Mich. 949, 620 N.W.2d 528 (2001) (pro se defendant sought leave to appeal denial of appointment of appellate counsel to the Michigan Court of Appeals and the Michigan Supreme Court); *People v. Jackson*, 463 Mich. 949, 620 N.W.2d 528 (2001) (same), and this Court, *see* Pet. for Cert. in *Halbert v. Michigan*, O.T.2004, No. 03–10198 (pending request for writ of certiorari by a pro se defendant challenging the denial of appellate counsel). While we agree that an attorney would be valuable to a criminal defendant challenging the constitutionality of the scheme, we do not think that the lack of an attorney here is the type of hindrance necessary to allow another to assert the indigent defendants' rights.[88]

---

[86] *Kowalski*, 543 U.S. at 127-28.

[87] *Id*. at 130-31.

[88] *Id*. at 132. We acknowledge that the *Kowalski* Court was also clearly displeased with the attorneys in the case for attempting to circumvent state proceedings by filing in federal court. *See id*. at 132-33.

Thus, in *Kowalski,* the Court held that the fact that indigent defendants can, and have, challenged statutes in state and federal court without the assistance of counsel dispositively demonstrated that there was no genuine obstacle or hindrance to such defendants challenging the Michigan statute on their own behalf.  But the same principles did not apply in *Singleton.*  In *Singleton,* the plurality acknowledged that women can, and have, challenged abortion statutes pseudonymously, and that pregnancy is an explicit exception to mootness under the "capable of repetition, yet evading review" doctrine.  Yet it still held that there were genuine obstacles preventing the women who possessed the right to abortion from challenging the statute on their own behalf.  This kind of inconsistency and improper application was exactly what the *Dobbs* Court was referring to when it said that its abortion cases "have ignored the Court's third-party standing doctrine."[89]

As mentioned, the *Dobbs* Court provided support for this criticism by citing to the dissents in *Whole Woman's Health* and *June Medical.*[90]  In both cases, as in *Singleton,* the dissenting opinions discussed the glaring misapplication of the *jus tertii* doctrine in cases involving abortion providers seeking to assert the constitutional right of their patients.

In *Whole Woman's Health*, Justice Thomas dissented to emphasize, *inter alia,* "the Court's habit of applying different [third-party standing] rules to

---

[89] *Dobbs*, 142 S. Ct. at 2275.

[90] *Id.* at 2275 n. 61.

different constitutional rights—especially the putative right to abortion."[91] Justice Thomas pointed out that the very existence of the suit was "a jurisprudential oddity" made possible by the Court's repeated allowance of "abortion clinics and physicians to invoke a putative constitutional right that does not belong to them—a woman's right to abortion."[92]

In *June Medical*, the statute at issue required any physician who performed abortions to have admitting privileges at a hospital within 30 miles of where an abortion was performed or induced.[93] Justice Alito's dissent focused on the fact that the case featured "a blatant conflict of interest between an abortion provider and its patients."[94] He reasoned that the statute was enacted with a mind to protect the health and safety of women who opt to receive an abortion, but "an abortion provider has a financial interest in avoiding [such] burdensome regulations" as "[a]pplying for privileges takes time and energy, and maintaining privileges may impose additional burdens."[95] The dissent contended that allowing the abortion providers to assert the rights of its patients when such a conflict may exist was in clear contradiction to *Elk Grove Unified School District v. Newdow*,[96] wherein the Court held that third-party standing was not appropriate when there is a potential conflict of interest

---

[91] *Whole Woman's Health*, 136 S. Ct. at 2321 (Thomas, J., dissenting).

[92] *Id.* at 2321-22.

[93] *June Med.*, 140 S. Ct. at 2113.

[94] *Id.* at 2166.

[95] *Id.*

[96] 542 U.S. 1 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

between the plaintiff and the third party.[97] In *Elk Grove,* a father who was an atheist alleged that his daughter had a constitutional right not to hear others recite the words "under God" during her public school's daily recitation of the Pledge of Allegiance.[98] The child's mother alleged that the child had no objection to hearing or reciting the Pledge.[99] The Court held that the father lacked prudential standing because "the interests of [the] parent and [the] child [were] not parallel and, indeed, are potentially in conflict."[100]

In addition, Justice Alito contended that the record demonstrated that the abortion providers had not shown that the *jus tertii* requirements were met.[101] He asserted that there was no close relationship between the abortion physicians and their patients because the evidence demonstrated their consultations were fleeting and the procedures required little to no follow up.[102] Concerning the "hindrance" prong, Justice Alito reiterated the arguments espoused in the *Singleton* dissent as recounted above.[103]

Notwithstanding the foregoing, the abortion providers ask this Court to hold that they have satisfied the requirements for third-party standing based on U.S. Supreme Court precedents that have been strongly, and rightfully,

---

[97] *June Med.,* 140 S. Ct. at 2167.

[98] *Elk Grove,* 542 U.S. at 4-5.

[99] *Id.*

[100] *Id.* at 15.

[101] *June Med.,* 140 S. Ct. at 2168.

[102] *Id.*

[103] *Id.* at 2168-69.

discredited. This we cannot do, and based on the following, we hold that the abortion providers did not carry their burden to demonstrate that third-party standing is warranted in this case.

The abortion providers have suffered an injury in fact for the reasons discussed in Part II(A)(1) of this Opinion. But, even if the abortion providers are correct that they have a requisitely close relationship with their patients, which is difficult to discern based on the record before us, they have not shown that there is a hinderance or genuine obstacle to their patients challenging the trigger ban and heartbeat ban on their own behalf.

The abortion providers allege that the genuine hindrance requirement is met because their patients fear that their decision to receive an abortion will become public, even if they sue pseudonymously. However, they have provided no argument as to why their patients would be *unable* to challenge the bans pseudonymously, nor have they explained why a court order would be insufficient to ensure their patients' identities remain protected. It is also worth noting that our jurisprudence contains an example of a class of plaintiffs suing pseudonymously in order to protect highly sensitive information. In *Doe v. Potter*, a class of anonymous plaintiffs filed a class action suit against the Roman Catholic Diocese of Covington and its Bishop for the sexual abuse they endured as children by priests and other Diocese employees.[104] There is no reason that this Court can discern that would prevent women seeking to

---

[104] 225 S.W.3d 395, 397 (Ky. App. 2006).

36

challenge the trigger ban and heartbeat ban from proceeding anonymously, as has been done before in cases such as *Roe v. Wade*. Accordingly, there is no genuine hindrance to them asserting their own constitutional rights, and the *jus tertii* requirements are not satisfied.

There are additional considerations that caution against allowing third-party standing in this case that warrant brief discussion. As Justice Alito argued in his *June Medical* dissent, there appears to be a conflict of interest between the abortion providers and their patients under the statutes at issue. As Justice Keller warns in her opinion, the statutes might create a situation wherein a physician has a gravely ill pregnant patient, but because of the threat of criminal and civil penalties under the bans, the physician may hesitate in rendering life-saving treatment to the pregnant patient or altogether fail to render that treatment. And, under the heartbeat ban, a woman may sue a physician that performs or induces an abortion upon her in violation of that statute.[105] Consequently, the abortion providers' interest in not being civilly or criminally prosecuted under the statutes appears to potentially conflict with a pregnant woman's interest in receiving adequate medical care. Permitting the abortion providers to proceed with third-party standing would accordingly violate *Elk Grove*'s holding that third-party standing is improper when the plaintiff's interests are potentially in conflict with the third party's interests.

---

[105] KRS 311.7709(2).

In addition, we must be mindful of not allowing bad facts to make bad law and an unworkable precedent. To permit third-party standing under these facts would, in essence, render the genuine hindrance requirement meaningless. In turn, this could result in increased instances of third-party standing being permitted in other cases when there is meant to be a very strong presumption against it.

Based on the foregoing, we cannot hold that the abortion providers in this case have demonstrated that granting them third-party standing to assert the rights of their patients is appropriate. We are acutely aware that abortion is perhaps the most polarizing and difficult issue we face as members of this Court, this Commonwealth, and this country. But we must honor separation of powers and act only when the constitution permits. This Court finds itself in the exceedingly rare position of being able to learn from a mistake in applying the law that our esteemed brothers and sisters on the U.S. Supreme Court have openly acknowledged making. To perpetuate that mistake in our own courts by creating a special exception for third-party standing in Kentucky cases involving abortion would "deliver neither predictability nor the promise of a judiciary bound by law,"[106] and we therefore decline to do so.

## B. The circuit court abused its discretion by granting the abortion providers' motion for a temporary injunction.

To summarize, the abortion providers lack third-party standing to challenge either of the bans on behalf of their patients, and they lack first-party

---

[106] *Whole Woman's Health*, 136 S. Ct. at 2321 (Thomas, J., dissenting).

38

standing to challenge the heartbeat ban. However, they have first-party

standing to challenge the trigger ban on the grounds that it was an

unconstitutional delegation of the General Assembly's legislative power and

became effective upon the authority of an entity other than the General

Assembly. Accordingly, we must address whether the circuit court's grant of a

temporary injunction on those grounds was appropriate.

Appellate courts review a trial court's grant or denial of a temporary

injunction for abuse of discretion.[107] A trial court abuses its discretion when

its decision "was arbitrary, unreasonable, unfair, or unsupported by sound

legal principles."[108] Here, if the circuit court abused its discretion in granting

the temporary injunction, we must grant the Attorney General's motion for

interlocutory relief, and vice versa.[109]

The well-established standards for demonstrating entitlement to

injunctive relief under CR 65.04[110] are as follows:

> [f]irst, the trial court should determine whether plaintiff has
> complied with CR 65.04 by showing irreparable injury. This is a
> mandatory prerequisite to the issuance of any injunction.
> Secondly, the trial court should weigh the various equities
> involved. Although not an exclusive list, the court should consider
> such things as possible detriment to the public interest, harm to

---

[107] *Maupin*, 575 S.W.2d at 698.

[108] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[109] *See Boone Creek Props., LLC v. Lexington-Fayette Urban Cty. Bd. of Adjustment*, 442 S.W.3d 36, 41 (Ky. 2014).

[110] CR 65.04(1) ("A temporary injunction may be granted during the pendency of an action on motion if it is clearly shown by verified complaint, affidavit, or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss, or damage pending a final judgment in the action, or the acts of the adverse party will tend to render such final judgment ineffectual.").

the defendant, and whether the injunction will merely preserve the status quo.  Finally, the complaint should be evaluated to see whether a substantial question has been presented.  If the party requesting relief has shown a probability of irreparable injury, presented a substantial question as to the merits, and the equities are in favor of issuance, the temporary injunction should be awarded.[111]

The underlying purpose behind these requirements "is to insure that the injunction issues only where absolutely necessary to preserve a party's rights pending the trial of the merits."[112]  "Notably, a motion for a temporary injunction does not call for, or justify, an adjudication of the ultimate rights of the parties . . .  and should issue only where it is clearly shown that one's rights will suffer immediate and irreparable injury pending trial."[113]

As to the threshold showing, irreparable injury, a party must "allege possible abrogation of a concrete *personal* right."[114]  The circuit court found that a likelihood of irreparable harm was present based on the following:

waiting for final judgment on the issues presented here, without injunctive relief, would be effectively meaningless to many people because they would either be past gestational age restrictions or would have been forced to carry their pregnancy to term. Therefore, the [abortion providers] have demonstrated they would suffer irreparable harm if injunctive relief is not provided.

Thus, by its very language, the circuit court's finding of irreparable injury was based on the lack of access to abortion suffered by the abortion providers'

---

[111] *Maupin*, 575 S.W.2d at 699.

[112] *Id.* at 698.

[113] *Cameron v. Beshear*, 628 S.W.3d 61, 71–72 (Ky. 2021) (internal quotation marks and citations omitted).

[114] *Maupin*, 575 S.W.2d at 698 (emphasis added).

*patients.* But, for the reasons articulated in Section II(A)(2) of this Opinion, the abortion providers did not have third-party standing to challenge the trigger ban based upon alleged violations of their patients' constitutional rights. Accordingly, the circuit court abused its discretion by finding that the irreparable harm requirement was satisfied, as it did not find that "the [abortion providers'] rights are being or will be violated . . . and the [abortion providers] will suffer immediate and irreparable injury, loss, or damage pending a final judgment in the action[.]"[115] Further, the personal harm asserted by the abortion providers, the harm to their business, is not considered an irreparable injury for the purposes issuing a temporary injunction.[116]

The circuit court also erred when balancing the equities involved. When addressing this element, the circuit court altogether failed to consider the presumption that all statutes passed by our General Assembly, regardless of their subject matter, "were enacted by the legislature in accordance with constitutional requirements."[117] "It is uncontroverted that a statute is presumed to be constitutional unless it clearly offends the limitations and prohibitions of the Constitution."[118] In that vein, in addressing harm to the

---

[115] CR 65.04(1).

[116] *Norsworthy v. Kentucky Bd. of Med. Licensure*, 330 S.W.3d 58, 62 (Ky. 2009) ("In order to obtain a preliminary injunction, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. Further, mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.").

[117] *Cameron*, 628 S.W.3d at 73 (quoting *Beshear v. Acree*, 615 S.W.3d 780, 805 (Ky. 2020)).

[118] *See, e.g.*, *Commonwealth v. Harrelson*, 14 S.W.3d 541, 547 (Ky. 2000).

41

public interest, the circuit court failed to contemplate that "[c]onsidering that the General Assembly is the policy-making body for the Commonwealth, not the Governor or the courts, equitable considerations support enforcing a legislative body's policy choices. In fact, non-enforcement of a duly-enacted statute constitutes irreparable harm to the public and the government."[119] The presumption that statutes are constitutionally passed represents a respect for the General Assembly's authority that the judiciary, as its co-equal branch, must recognize. The circuit court accordingly further abused its discretion by failing to start from the presumption that the bans were constitutionally enacted when balancing the equities, and the Court of Appeals was correct in holding that the temporary injunction was improperly entered.

To be clear, this opinion does not in any way determine whether the Kentucky Constitution protects or does not protect the right to receive an abortion, as no appropriate party to raise that issue is before us. Nothing in this opinion shall be construed to prevent an appropriate party from filing suit at a later date.

### III. CONCLUSION

Based on the foregoing, the circuit court abused its discretion by granting the abortion providers' motion for a temporary injunction against both the trigger ban and the heartbeat ban. Accordingly, we must affirm the Court of Appeals' grant of interlocutory relief to the Attorney General. The abortion

---

[119] *Cameron*, 628 S.W.3d at 73 (citing *Boone Creek*, 442 S.W.3d at 40)).

providers do not have third-party standing to challenge the trigger ban or the heartbeat ban on the grounds that those statutes violated their patients' constitutional rights, and they do not have first-party, constitutional standing to challenge the heartbeat ban. However, the abortion providers have first-party constitutional standing to challenge the trigger ban. This matter is accordingly remanded to the circuit court for the determination of the first-party constitutional claims of the abortion providers as to the trigger ban. Specifically, whether the trigger ban was an unlawful delegation of legislative authority in violation of Sections 27, 28, and 29 of the Kentucky Constitution and if the trigger ban became effective upon the authority of an entity other than the General Assembly in violation of Section 60 of the Kentucky Constitution.

All sitting. Conley, J. concurs. VanMeter, C.J., concurs in result only. Bisig, J., concurs in part and dissents in part by separate opinion in which Keller, J., joins. Keller, J., concurs in part and dissents in part by separate opinion in which Bisig, J., joins. Nickell, J., concurs in part and dissents in part by separate opinion. Thompson, J., concurs in part and dissents in part by separate opinion.

***

BISIG, J., CONCURRING IN PART, DISSENTING IN PART:

While acknowledging that the citizens of our Commonwealth have strong and deeply-held opinions on both sides of the underlying issue—and indeed even likely have loved ones with differing views—the task currently before the

43

Court is whether the trial court may properly consider, under current law, the constitutional claims of those challenging the impact of the Heartbeat Ban and Trigger Ban (hereinafter "Bans").  Today, a majority of this Court retreats from the duty of judicial review by failing to evaluate whether Plaintiffs present substantial allegations that the Bans unconstitutionally prohibit the women of this Commonwealth from obtaining reproductive healthcare.

In so doing, the majority's decision permits the criminal prosecution of persons who assist incest and rape victims in terminating a resulting unwanted pregnancy.  It fails to reject the untenable assertion of the Attorney General that the appropriate "status quo" is the 1879 case of *Mitchell v. Commonwealth*, 78 Ky. 204, rendered at a time when women were wholly barred from participating in government, the political process, or the making of laws for the Commonwealth.  And the decision allows enforcement of the Bans despite *its own express acknowledgement* that those statutes may "create a situation wherein a physician has a gravely ill pregnant patient, but because of the threat of criminal and civil penalties under the bans, the physician may hesitate in rendering life-saving treatment to the pregnant patient *or altogether fail to render that treatment.*" (Emphasis added).

Make no mistake: in concluding—despite decades of well-settled jurisprudence to the contrary—that Plaintiffs lack third-party standing to assert the rights of their patients, the majority declines its responsibility to ensure the citizens of this Commonwealth are not left without a forum to address substantial allegations of constitutional infirmity:

44

> The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.

*Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 209 (Ky. 1989).

This Court wrote these sage words more than thirty years ago when, as here, it faced a question regarding the constitutionality of acts by the General Assembly. These words were not some hollow, passing utterance. They were this Court's solemn recognition of its role under our tripartite form of government to act, on a limited basis when necessary, as a check and balance against allegedly unconstitutional acts by the General Assembly.

The majority decision is premised on a misapplication of non-controlling statements in *federal* caselaw, fails to acknowledge the significant hurdles faced by citizens seeking to enforce their claimed constitutional rights in a court of law, and argues alleged conflicts of interest between patients and reproductive healthcare providers where none exist. It fails to reach the full merits of the trial court's issuance of a temporary injunction and allows the trial court on remand to proceed only with a limited hearing that will leave Plaintiffs' substantial allegations of constitutional infirmity unaddressed.[120]

---

[120] As discussed in further detail below, Plaintiffs' alleged lack of third-party standing may be cured by moving to add a patient as a plaintiff to their case. Should that occur, the trial court would of course be free to consider the constitutional rights of that patient as well as those of the current Plaintiffs.

Put simply, the decision removes a forum for a balancing of the two important competing interests at issue in this case—the state's interest in the protection of unborn life and a woman's interest in bodily autonomy and self-determination.

Thus, while I concur with the majority's conclusion that Plaintiffs have first-party standing to challenge the Trigger Ban and with their recognition of third-party standing for purposes of Kentucky law, I respectfully dissent from the remainder of their Opinion. I would reverse the Court of Appeals, affirm the trial court, and direct reinstatement of the temporary injunction.

### I. The Trial Court Did Not Abuse Its Discretion In Granting Emergency Legal Relief.

Though a discussion of standing typically—and logically—precedes the analysis of other matters relevant to an appeal, I recognize the importance of the constitutional issues raised in this case to all citizens of the Commonwealth. I therefore reserve my discussion of standing, *see infra* Part II, and begin by noting that I would find the trial court did not err in granting temporary injunctive relief pending a final judicial determination on the merits.

In determining whether temporary injunctive relief is warranted, a trial court should first consider whether the movant has alleged and proven facts from which the court can reasonably infer the movant will suffer irreparable harm absent injunctive relief. *Maupin v. Stansbury*, 575 S.W.2d 695, 698-99 (Ky. App. 1978), *as modified* (Oct. 13, 1978). Such a showing "is a mandatory prerequisite to the issuance of any injunction." *Id.* at 699. Second, the trial court should weigh the equities, including by considering whether injunctive

46

relief would cause any possible detriment to the public interest or harm to the other parties, and whether injunctive relief would merely preserve the status quo. *Id.* Third, the trial court should consider whether the movant's claims present "a substantial question." *Id.*

Injunctive relief is "an extraordinary remedy . . . addressed to the sound discretion of the trial court." *Id.* at 697-98. As such, we disturb a trial court's determination as to temporary injunctive relief only for clear abuse of that discretion. *Commonwealth of Kentucky, ex rel. Conway v. Thompson*, 300 S.W.3d 152, 162 (Ky. 2009), *as corrected* (Jan. 4, 2010). Where, as here, a party seeks interlocutory relief from the granting of a temporary injunction, it bears an "enormous burden" to demonstrate that such relief was an abuse of discretion. *Cameron v. Beshear*, 628 S.W.3d 61, 71-72 (Ky. 2021).

**A. Irreparable Harm: Plaintiffs Face Injuries That Cannot Be Undone.**

I conclude the trial court did not err in finding that Plaintiffs have shown "a probability of irreparable injury." *Id.* As an initial matter, I recognize that the purpose of the Bans is the state's interest in the protection of unborn life. That interest is undeniably strong.

However, the General Assembly may not act unconstitutionally, even in furtherance of unquestionably strong interests. When the General Assembly passes an unconstitutional statute, such a statute "is no law at all." *Harrod v. Whaley*, 239 S.W.2d 480, 482 (Ky. 1951). The government's inability to enforce such a statute occasions no harm to the public but rather protects the public's interest in legislation consistent with constitutional protections and limitations.

47

Thus, while we generally presume that non-enforcement of constitutionally sound statutes results in irreparable harm to the government and the public, we must also be careful not to apply that presumption so liberally as to abdicate our responsibility to safeguard the constitutional rights of the citizens of this Commonwealth. Where a plaintiff alleges the General Assembly has passed a statute that violates our Constitution, the judiciary must "uphold[] our duty faithfully to interpret the Kentucky Constitution." *Legis. Rsch. Comm'n v. Fischer*, 366 S.W.3d 905, 911 (Ky. 2012). And where the plaintiff's constitutional claim is ultimately determined to have merit, "'[i]t is within the province and power of the courts to declare void and ineffective for any purpose all [A]cts of the General Assembly in violation of an express provision of the Constitution.'" *Id.* at 918-19. Indeed, "[i]t is our sworn duty" to decide duly presented questions regarding the interpretation of our Kentucky Constitution. *Rose*, 790 S.W.2d at 209. "The duty of the judiciary in Kentucky was so determined when the citizens of Kentucky enacted the social compact called the Constitution and in it provided for the existence of a third equal branch of government, the judiciary." *Id.*

Indeed, the application of an unyielding presumption that the acts of the General Assembly are constitutional and should be enforced would leave Kentuckians with little or no ability to obtain relief from unconstitutional statutes. It cannot be that no duly-enacted statute could ever be challenged. *See id.* ("To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is *literally unthinkable*.")

48

(Emphasis added). As such, when faced with a substantial claim that a statute violates our Constitution, we should engage in a more searching inquiry to determine whether the allegations of constitutional infirmity are sufficiently serious to overcome our presumption that non-enforcement of the provision will irreparably harm the government.

As discussed in further detail below, Plaintiffs here raise a substantial question as to the constitutionality of the Bans. Indeed, their concerns have sufficient gravity that they may not be classified as wholly "doubtful." Thus, though mindful of the general presumption that non-enforcement of a duly-enacted law results in irreparable harm, I proceed also to consider irreparable harm faced by other parties.

I conclude that the trial court did not abuse its discretion in finding that Plaintiffs will suffer irreparable harm absent injunctive relief. The trial court's factual determination regarding irreparable harm is binding upon us unless clearly erroneous. *Boone Creek Props., LLC v. Lexington-Fayette Urban Cnty. Bd. of Adjustment,* 442 S.W.3d 36, 39-40 (Ky. 2014) ("The trial court's factual determination that irreparable harm would occur in the absence of an injunction was not clearly erroneous and so is binding upon this Court in our review of [movant's] challenge to the injunction."). That is, we are bound to accept that finding so long as it is supported by "'[e]vidence that a reasonable mind would accept as adequate to support a conclusion' and evidence that, when 'taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men.'" *Moore v. Asente,*

49

110 S.W.3d 336, 354 (Ky. 2003). This is so even if there is conflicting evidence, if we disagree as to the weight of the evidence, if we might have reached a contrary finding, or whether we doubt the correctness of the finding. *Id.*

The trial court based its conclusion on competent testimony by Plaintiffs' expert Dr. Bergin that Plaintiffs cancelled appointments for more than 200 patients following the Bans coming into effect. The trial court also cited testimony that pregnant women face increasing medical harm and risks from the loss of these appointments.[121] The trial court further noted that ultimate judicial relief following a trial would effectively be meaningless given the passage of time, gestational age restrictions, and the typical length of human gestation. In other words, the trial court received competent testimony that with enforcement of the Bans, pregnant women now face a growing risk of pregnancy-related harms and risks that grow with time and against which a final judgment might offer no meaningful relief.

As noted above, the majority itself acknowledges that the statutes may

> create a situation wherein a physician has a gravely ill pregnant patient, but because of the threat of criminal and civil penalties under the bans, the physician may hesitate in rendering life-saving treatment to the pregnant patient or altogether fail to render that treatment.

---

[121] As discussed in further detail below, I conclude Plaintiffs have third-party standing. I therefore would find no error in the trial court's consideration of patient rights and harms suffered by them.

If the Bans' result of causing physicians to withhold "life-saving treatment" from patients—the obvious result of which is death of the patient—is not irreparable harm, what is?

We need not merely speculate as to the pragmatic effect these Bans have on healthcare providers tasked with treating pregnant patients. Just last week the *Lexington Herald Leader* detailed the experiences of two women placed in untenable positions due to severe fetal anomalies and the extremely limited healthcare options available.[122] In both situations, the women experienced unequivocally nonviable pregnancies and their healthcare providers advised their babies would live for hours or days, at best. Healthcare providers informed the women that they could not provide appropriate reproductive healthcare because of Kentucky law. These real-world examples demonstrate how the Bans undoubtedly impact both healthcare providers and patients in concrete ways.[123]

---

[122] Alex Acquisto, *A 'twisted' experience: How KY's abortion bans are depriving pregnant patients of health care,* LEXINGTON HERALD LEADER (Feb. 10, 2023), https://www.kentucky.com/news/politics-government/article271925592.html.

[123] One woman was able to obtain relief while the temporary injunction was in place, allowing her to receive an abortion at EMW Women's Surgical Center. Of course, that relief is currently unavailable given the majority's holding. The other woman was left with no options, other than to carry her son to term, deliver him, and watch him undergo palliative care, where he would live for minutes, maybe hours. The woman sought care out of state, opting to drive nearly 400 miles to Illinois where she was induced at 21 weeks' gestation and gave birth to her son, whose heart beat for approximately two minutes before it stopped. Distressingly, many Kentuckians do not possess the financial resources or means to travel and obtain care out-of-state.

Yet the majority fails to enjoin the Bans even temporarily pending a trial as to the merits of the Plaintiffs' substantial allegations of unconstitutionality. I would hold that the record here contains evidence sufficient to support the trial court's finding of irreparable harm.

I further pause to note that although the trial court's findings alone are sufficient to support its conclusion, the extremely limited medical emergency exceptions and the lack of any exception for rape or incest in the Bans also demonstrates an additional—and profoundly grave—risk of irreparable harm. Indeed, it cannot reasonably be disputed that a woman who is forced against her will to carry a pregnancy to term following rape or incest faces not merely "irreparable harm," but an overwhelming, devastating, and tragic injury that can never be remedied. Thus—and again although the trial court's findings alone were sufficient—I readily conclude that the Bans' limited medical emergency exceptions and lack of exceptions for rape or incest likewise indisputably satisfy the requirement of irreparable harm.

### B. Balancing Of The Equities: The Temporary Injunction Is In The Public Interest And Preserves The Status Quo.

I would also conclude that the trial court did not abuse its discretion in finding that a balancing of the equities, including consideration of detriment to the public interest, harm to the defendants, and preservation of the status quo, favors injunctive relief. *See Maupin*, 575 S.W.2d at 699. Admittedly, equity generally weighs in favor of enforcing the duly-enacted statutes of the General Assembly given that body's unique role in establishing the public policy of our Commonwealth. *Cameron*, 628 S.W.3d at 73. Indeed, the General Assembly's

enactment of a statute entails an "'implied finding' that the public will be harmed if the statute is not enforced." *Id.* at 78. We thus generally defer to the General Assembly's expertise in setting public policy and recognize equity's strong preference for enforcement of duly-enacted and constitutionally sound statutes.

This preference must be tempered when we are faced with a substantial allegation that an act of the General Assembly violates the protections and limitations of our Constitution. While a trial court generally should not "substitute[] its view of the public interest for that expressed by the General Assembly," *id.*, when presented with a serious allegation of constitutional infirmity it should engage in a more searching inquiry as to whether enforcement of the challenged statute pending a final determination on the merits would serve the public interest.

Here, while the trial court appropriately considered the potential harm delayed enforcement would occasion upon the government, it likewise appropriately weighed that injury against harm occasioned upon Plaintiffs and the public by enforcement of the Bans before a final determination as to their constitutionality. In finding that such enforcement would be contrary to the public interest, the trial court relied on testimony by Plaintiffs' expert Dr. Lindo that it would cause economic harm to Kentuckians, particularly "poorer and disadvantaged members of society." The trial court also relied on Dr. Lindo's testimony regarding the educational and professional harms enforcement of the Bans would cause to the pregnant women of the Commonwealth. The trial

53

court acknowledged the harm of delayed enforcement faced by the government, but ultimately concluded that harm was outweighed by the economic, educational, and professional harms identified by Plaintiffs. I cannot conclude the trial court's weighing of these harms was a clear abuse of discretion, and therefore would leave that finding undisturbed. *Thompson*, 300 S.W.2d at 162 ("[A]n appellate court may not disturb a trial court's decision on a temporary injunction unless the trial court's decision is a clear abuse of discretion.").

Likewise, I would find no error in the trial court's conclusion that temporary injunctive relief would merely preserve the status quo. As the trial court noted, the Bans altered the regulatory scheme for reproductive healthcare that had existed in Kentucky for more than fifty years. It simply cannot be legitimately argued that this Court should return to a status quo in 1879 when women had no legal right to participate in their government.

### C. Substantial Question: Plaintiffs Present A Plausible Legal Claim Of Profound Significance To All Kentuckians.

Finally, a party seeking temporary injunctive relief must also "present a substantial question as to the merits of [its] Complaint." *Cameron*, 628 S.W.3d at 72. Where, as here, there is a probability of irreparable injury and the equities favor injunctive relief, "it is sufficient if the complaint raises a serious question warranting a trial on the merits." *Maupin*, 575 S.W.2d at 699. I would find that the trial court did not abuse its discretion in concluding that Plaintiffs' claims satisfy this standard.

Plaintiffs' claim that access to reproductive healthcare falls within our Constitution's protection of the rights to safety and self-determination is

54

entirely plausible, particularly given the evidence received by the trial court regarding the numerous and increasing health risks faced by women during the course of a pregnancy. *See* KY. CONST. § 1; *Woods v. Commonwealth of Kentucky, Cabinet for Hum. Res.*, 142 S.W.3d 24, 43 (Ky. 2004) (noting the "constitutional right of self-determination"). These rights are implicated in perhaps even greater measure by the limitations on the Bans' medical emergency exceptions and the Bans' lack of any exception for cases of rape or incest. The issue of access to reproductive healthcare also presents the question of the extent to which each individual is afforded bodily autonomy under our Constitution. *See Commonwealth v. Campbell,* 133 Ky. 50, 117 S.W. 383, 386 (1909) ("'Over [her]self, over [her] own body and mind, the individual is sovereign.'") (quoting John Stuart Mill, *On Liberty* 22, 23). Plaintiffs' claims also raise important questions regarding family planning and whether the Bans impermissibly exceed the scope of appropriate governmental involvement in such matters. Similarly, the historical background can be used to argue that Kentucky traditionally did not criminalize at least pre-quickening abortions. Plaintiffs' assertions of vagueness and violation of delegation principles likewise raise valid questions.

Plaintiffs have presented a "serious question" as to the merits of their claims. Plaintiffs' claims present not only "serious questions," but ones of profound significance to Kentuckians on all sides of this issue. Indeed, few issues in our society are so hotly disputed and universally debated as the legal

landscape regarding the governmental interest in protecting fetal life and reproductive freedom rights.

Though Plaintiffs' claims are not certain to prevail, neither are they so lacking in merit as to be characterized as "doubtful." Defendants have not pointed the trial court or this Court to any dispositive authority holding that the Kentucky Constitution does not limit restrictions on access to reproductive healthcare. Kentuckians recently declined to incorporate into our Constitution an explicit answer to that thorny question, leaving it to us in our role as interpreters of the Constitution to determine the issue. The judiciary is remiss for refusing to do so.

## II.    Standing: Plaintiffs Have The Legal Ability To Bring Their Claims.

Kentucky courts lack constitutional jurisdiction to adjudicate matters in which the plaintiff lacks standing. *Commonwealth v. Bredhold*, 599 S.W.3d 409, 414 (Ky. 2020). In *Commonwealth, Cabinet for Health & Family Services, Department for Medicaid Services v. Sexton ex rel. Appalachian Regional Healthcare*, 566 S.W.3d 185, 188 (Ky. 2018), this Court "adopt[ed] the United States Supreme Court's test for standing as espoused in *Lujan v. Defenders of Wildlife*." (Footnote omitted.) *Lujan*, 504 U.S. 555, 560-61 (1992), enumerates three requirements to establish constitutional standing: injury, causation, and redressability. Generally, the doctrine of standing is intended to ensure that courts "do not address non-existent issues or provide advisory opinions." *Bredhold*, 599 S.W.3d at 417 (citing *Sexton*, 566 S.W.3d at 192-97). I would find that Plaintiffs have both first-party and third-party standing.

56

### A. First-Party Standing: Plaintiffs Can Pursue Claims On Their Own Behalf.

Plaintiffs meet the requirements for first-party standing. All are abortion providers and, indeed, EMW's primary business is the provision of abortion services. Prior to the Bans, Plaintiffs offered abortion services under license from the Commonwealth of Kentucky but when the Bans went into effect Plaintiffs were forced to cease all abortion services or face criminal prosecution. The resulting economic damage from compliance with the Bans is sufficient injury in fact to confer standing on Plaintiffs themselves to bring this challenge. The economic injury is real and present and its cause is indisputably the Bans. This litigation can redress Plaintiffs' injury if their legal claims are sustained, thus satisfying all three requirements for standing under *Sexton.* Accordingly, no possibility exists that, by addressing the issues raised by these litigants who were forced to discontinue providing abortion services, the Court would consider a "non-existent issue" or render an "advisory opinion." *Bredhold,* 599 S.W.3d at 417.

### B. Third-Party Standing: Plaintiffs Can Pursue Claims On Behalf Of Their Patients.

Plaintiffs also brought suit on behalf of their staff and their patients, thereby invoking third-party standing. I concur with the majority's recognition today that for purposes of Kentucky law, a litigant has third-party standing to assert claims on behalf of parties not actually before the court if the litigant demonstrates "(1) an injury in fact that gives the litigant a sufficiently concrete interest in the outcome of the dispute; (2) a close relationship between the

57

litigant and the non-party individual or individuals whose rights the litigant seeks to assert; and (3) that there exists a genuine obstacle or hindrance to the possessor of the right's ability to assert his or her own interest."

Historically, this logic has been applied to abortion providers to find that they have third-party standing to assert the rights of their patients. *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 (1976). As recently as 2020, the United States Supreme Court recognized that federal courts "have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118 (2020) (citing *Danforth*, 428 U.S. at 62; *Doe v. Bolton*, 410 U.S. 179, 188-89 (1973); and seven other United States Supreme Court cases rendered over the preceding forty-seven years recognizing abortion providers had standing to invoke patients' rights).

The majority spends significant time discussing whether *Dobbs* refuted these well-established rules regarding third-party standing. Perhaps most obviously, *Dobbs* is a non-controlling *federal* case applying *federal* law. In addition, the majority is simply wrong in any event that *Dobbs* did away with years of federal caselaw finding that reproductive healthcare providers have third-party standing. Standing was not even an issue in the *Dobbs* case, a challenge to Mississippi's statute banning abortion after fifteen-weeks' gestation brought by Jackson Women's Health Organization, the state's sole abortion facility, and one of its physician-providers. Addressing generally the effects of *Roe v. Wade*, and the Court's prior precedent recognizing the right to

abortion, the majority opinion made a single, isolated comment on standing: "[The Court's abortion cases] have ignored the Court's third-party standing doctrine." *Dobbs*, 142 S. Ct. at 2275. The *Dobbs* majority did not elaborate on this passing comment nor did it seize the opportunity right before it to dismiss the case on standing grounds if it intended to change almost fifty years of standing precedent. To the contrary, the *Dobbs* Court proceeded to render a decision on the merits, even though the respondents in that case did not include any women who sought an abortion, rather than dismiss for lack of standing. *See* Petition for Writ of Certiorari, *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 2020 WL 3317135, at *ii (June 15, 2020) (identifying respondents as clinic "on behalf of itself and its patients" and doctor "on behalf of herself and her patients"). In short, nothing in *Dobbs* undermines the decades of court precedent, including the United States Supreme Court's recently-decided *June Medical Services LLC*, recognizing the third-party standing of abortion providers to represent the interests of their patients. So to the extent the majority concludes *Dobbs* forecloses a finding that Plaintiffs have third-party standing, it is both an incorrect reading of *Dobbs* as well as an unnecessary reliance on non-controlling federal caselaw.

The majority also errs in finding that patients seeking reproductive healthcare face no hindrance to their ability to enforce their constitutional rights. Quite simply, the majority fails to acknowledge the overwhelming expense and legal knowledge necessary to challenge the constitutionality of legislation in our courts of law. It cannot reasonably be questioned that the

59

overwhelming majority of Kentucky citizens lack the financial resources or legal knowledge to mount such a challenge on their own. Moreover, women affected are keenly aware of the Bans' impact and are engaged in the issue. When considered together rather than separately, the personal and financial costs faced by these third parties unquestionably rise to a level of hindrance sufficient to find Plaintiffs have third-party standing. In addition, it cannot reasonably be questioned that reproductive healthcare providers have a close relationship with their patients and have suffered injury in fact sufficient to have a concrete interest in the outcome of this case. The three elements of third-party standing, *i.e.* injury, a close relationship, and hindrance, are all present.

I also disagree with the majority's conclusion that a conflict of interest exists between Plaintiffs and their patients, much less a conflict sufficient to prevent third-party standing. The majority contends such a conflict arises because Plaintiffs face criminal and civil sanctions for providing the care their patients seek. However the true interest of the Plaintiffs, as made plain by the present case, is to provide reproductive healthcare. This interest aligns perfectly with patients' interest in receiving that healthcare. Thus, I would find that Plaintiffs have third-party standing.

As the majority appears to acknowledge, Plaintiffs in any event may easily remedy the alleged lack of third-party standing by moving the trial court to add an appropriate patient as a Plaintiff in their action. I also urge the trial court to engage in an expedited process to hear and consider this case on

60

remand. As this case has progressed through the court system, we were first asked to consider whether the trial court appropriately granted a preliminary injunction and whether the Court of Appeals appropriately prohibited enforcement of the injunction, but before we could reach that issue had to resolve the issue of standing. Due to the standing issue, the resolution of the underlying case on the merits has been delayed. Now that this Court has acted, and the majority opinion has upheld first-party standing for the Plaintiffs and rejected their third-party standing claims, it is my hope that the trial court moves with all due haste.

To avoid counterproductive and largely duplicative additional suits, it would be appropriate for the trial court to allow women with first party standing to join in this litigation if requested. It is consistent with good public policy to shepherd a single consolidated case on these issues to a speedy resolution. *See generally Wenk v. Ruby*, 412 S.W.2d 247, 249 (Ky. 1967) (observing that "piecemeal litigation is contrary to the policy of the courts."); *Ball v. Middlesboro Coca-Cola Bottling Works, Inc.*, 266 Ky. 364, 99 S.W.2d 205, 206 (1936) (recognizing that the public policy behind the doctrine of "law of the case" is based on the understanding that "litigation should be ended as speedily as is consistent with an orderly administration of justice"). Doing so will be much more efficient than requiring these women to file their own action(s) and to have multiple appeals in multiple actions.

Ultimately, the questions as to whether the Bans are constitutional are likely to make their way back to our Court. That process should happen as

61

quickly and completely as possible so that our review can then clarify the law in Kentucky for our citizens. As the majority expressly acknowledges, their Opinion "does not in any way determine whether the Kentucky Constitution protects or does not protect the right to receive an abortion." Thus, in the interim the majority Opinion in this case should not be used in the courts of this Commonwealth for the proposition that such a right is or is not constitutionally protected.

## CONCLUSION

I concur with the majority's conclusion that Plaintiffs have first-party standing to challenge the Trigger Ban and with their recognition of third-party standing for purposes of Kentucky law. For the foregoing reasons, I respectfully dissent from the remainder of their Opinion. I would reverse the Court of Appeals, affirm the trial court, and direct reinstatement of the temporary injunction.

Keller, J., joins.

\*\*\*

KELLER, J., CONCURRING IN PART AND DISSENTING IN PART: I concur with the Majority's holding that the physicians have first-party standing to assert their claims in the case at bar. However, I dissent from the remainder of the Majority's Opinion. Further, I join Justice Bisig's separate opinion, as I also believe that the physicians have third-party standing to assert the claims of their patients and that the trial court did not abuse its discretion in granting the temporary injunction. I write separately to emphasize that EMW presented

62

a substantial question on the merits based on illusory exceptions to these bans.

The very first section of the Bill of Rights of our Commonwealth's Constitution states as follows:

> All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:
>
> First: The right of enjoying and defending their lives and liberties.
>
> Second: The right of worshipping Almighty God according to the dictates of their consciences.
>
> *Third: The right of seeking and pursuing their safety and happiness.*
>
> Fourth: The right of freely communicating their thoughts and opinions.
>
> Fifth: The right of acquiring and protecting property.
>
> Sixth: The right of assembling together in a peaceable manner for their common good, and of applying to those invested with the power of government for redress of grievances or other proper purposes, by petition, address or remonstrance.
>
> Seventh: The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons.

KY. CONST. § 1 (emphasis added). The rights enumerated in this section are those that the Framers of our state's Constitution held most dear. The third of these is our citizens' "inherent and inalienable right[] . . . of seeking and pursuing their safety and happiness." *Id.* This right is held in the same regard as our other fundamental and essential rights such as the rights to liberty, to worship, to freedom of speech, to property, to assembly, and to bear arms. Thus, it must be protected as fervently as we protect those other rights.

63

As I opined in my separate opinion denying emergency interlocutory relief in this case,

> Members of the judiciary, and in fact all human beings, are often called upon to weigh competing interests. Rarely, however, are we tasked with weighing interests that are as heavy and as important as those at stake in the case at bar. The interests on both sides of this debate are compelling and bear on the health and welfare of all Kentuckians.

*EMW Women's Surgical Center, P.S.C. v. Cameron*, No. 2022-SC-0326-I, 2022 WL 3641196, at *2 (Ky. Aug. 18, 2022) (Keller, J., concurring in result only). My statement is just as true today as it was six months ago.

It is the duty of our Court and our Court alone to interpret our Commonwealth's Constitution. It is our North Star. This Court has often held that our state constitution provides "protection of individual rights greater than the federal floor." *Commonwealth v. Wasson*, 842 S.W.2d 487, 497 (Ky. 1992), *overruled on other grounds by Calloway Cnty. Sheriff's Dept. v. Woodall*, 607 S.W.3d 557 (Ky. 2020). We have explained, "Both the record of the 1890–91 debates and the opinions of Justices of this Court who were the contemporaries of our founding fathers express protection of individual liberties significantly greater than the selective list of rights addressed by the Federal Bill of Rights." *Id.* at 494. We have done so in numerous contexts, including the protection against double jeopardy,[124] the right of

---

[124] *Ingram v. Commonwealth*, 801 S.W.2d 321 (Ky. 1990), *overruled on other grounds by Commonwealth v. Burge*, 947 S.W.2d 805 (Ky. 1996).

confrontation,[125] the fundamental right to an education,[126] and the right to hybrid representation.[127] The same is true in the case at bar.

Therefore, I discuss at length the ways in which the constitutional rights of our citizens are threatened by the statutes at issue herein. After doing so, I briefly underscore additional harms suffered by physicians and the medical field which are not discussed within the Majority's Opinion.

## EMW PRESENTED A SUBSTANTIAL QUESTION ON THE MERITS OF ITS CLAIMS.

I rely on Justice Bisig's opinion for its explanation of the standard of review of temporary injunctive relief. I also rely on her discussion of the three requirements for injunctive relief from *Maupin v. Stansbury*, 575 S.W.2d 695, 699 (Ky. App. 1978). Because my opinion focuses on a pregnant patient's constitutional rights to medical self-determination and to the pursuit of safety, it is primarily concerned with the third element of the *Maupin* test: whether a substantial question exists on the merits. *Id.* Thus, I focus my analysis on that element.

The Constitutional rights at stake in this case are at the heart of the substantial question analysis. Those rights are fundamental rights, and statutes that infringe on fundamental rights are subject to a strict scrutiny analysis. Under such an analysis, it is clear that the trial court did not abuse

---

[125] *Dean v. Commonwealth*, 777 S.W.2d 900 (Ky. 1989), *overruled on other grounds by Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003).

[126] *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989).

[127] *Baucom v. Commonwealth*, 134 S.W.3d 591 (Ky. 2004).

its discretion in finding that EMW met its burden to show a substantial question on the merits as to both statutes at issue.

As already noted, the rights to medical self-determination and the pursuit of safety are enshrined in our state Constitution, although they are not found in the United States Constitution. Encompassed within the right to "enjoying and defending" our liberty is the right to self-determination. The right to self-determination, and specifically self-determination regarding medical decisions, was recognized as a common law right in *DeGrella ex rel. Parrent v. Elston*, 858 S.W.2d 698 (Ky. 1993). In that case, we explained, "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of other, unless by clear and unquestionable authority of law." *Id.* at 703 (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). We went on to quote with approval celebrated jurist Judge Benjamin Cardozo, who wrote, "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Id.* (quoting *Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (N.Y. 1914)). Finally, we noted that this same right was recognized by our predecessor Court in 1951 when it held that "the patient . . . had the right to decide whether she wished to undergo or refuse [a] medical procedure unless an immediate life-threatening emergency made it impractical

66

for the surgeon to obtain . . . consent." *Id.* (citing *Tabor v. Scobee*, 254 S.W.2d 474, 475–76 (Ky. 1951)).

Although we declined in *DeGrella* to determine whether the common law right to medical self-determination was protected by our state constitution, we made that determination in *Woods v. Commonwealth,* 142 S.W.3d 24 (Ky. 2004). In *Woods,* we noted that the right to forego medical treatment

> derives from the common law rights of self-determination and informed consent . . .; and in the liberty interest protected by the Fourteenth Amendment to the United States Constitution . . .; and, perhaps even more so, by Section 1 of the Constitution of Kentucky ("All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: First: The right to *enjoying and defending* their lives and liberties.").

*Id.* at 32. We acknowledged that the right to forego medical treatment "is not absolute" and that "[t]he individual's liberty interest must be balanced against relevant state interests." *Id.* (citing *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990)). However, it is clear from *Woods* that the right to medical self-determination is a right protected by our state's constitutional right to "enjoy[] and defend[] [our] lives and liberties." *Id.*

This Court has rendered few opinions regarding the right to self-determination and none on the pursuit of safety. Nevertheless, they permeate every aspect of our culture and livelihood as Kentuckians. Our ability to do for ourselves what must be done to preserve our life and safety take root in our strong belief in basic principles like self-defense, informed consent, and more commonly in our daily struggles for independence from control. The fact that

these rights have gone largely unquestioned for so long points not to our refusal of them, but rather to how pervasive they are.

Because the six-week ban and trigger law ("the statutes," collectively) both implicate these fundamental constitutional rights, they must pass strict scrutiny.[128] *D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003). "To survive strict scrutiny, the government must prove that the challenged action furthers a compelling governmental interest and is narrowly tailored to that interest." *Beshear v. Acree*, 615 S.W.3d 780, 816 (Ky. 2020) (citations omitted); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). The state's interest is in protecting life, as seen through the Legislature's naming of the trigger law "The Human Life Protection Act," as well as the clear definition of this interest within the text of the six-week ban.[129] Today, I acknowledge that interest as compelling. Whether the statutes at issue are narrowly tailored to that interest so that they do not infringe too greatly on a woman's rights to self-determination and to pursue safety, however, requires a deeper analysis.

The statutes at issue attempt to serve the state's interest by protecting fetal life at all stages of gestation. The statutes are broader in effect, however. Because the statutes lack meaningful exceptions or distinctions to protect the

---

[128] The Circuit Court only conducted a strict scrutiny analysis on the six-week ban. That court had already determined that the trigger law raised substantial questions not requiring a strict scrutiny analysis. However, EMW argues on appeal that the circuit court's ruling on self-determination applies equally to the trigger law.

[129] "The Commonwealth of Kentucky has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of an unborn human individual who may be born." KRS 311.7702(7).

life of the mother, they likely fail to be narrowly tailored to protecting life. In fact, in some instances, the effect of the statutes is to harm life.

The harmful overbreadth of the statutes stems directly from their impact on a pregnant woman's medical treatment. As discussed in an amicus brief to this Court by the American College of Obstetricians and Gynecologists, et al., "the Bans are . . . without any valid medical justification," and so jeopardize "the health and safety of pregnant Kentuckians and plac[e] extreme burdens and risks upon providers of essential reproductive health care."[130] There are many significant and varied risks associated with being pregnant, as testified to by Dr. Ashlee Bergin, an assistant professor at the University of Louisville School of Medicine in the Department of Obstetrics, Gynecology, and Women's Health. At the hearing on the temporary injunction in this case, Dr. Bergin testified that pregnant patients are at a higher risk for anemia, fatal blood clotting,[131] and high blood pressure. Studies show that an increasing number of pregnant patients in the United States have chronic health conditions such as hypertension, diabetes, and chronic heart disease. These conditions put a patient at higher risk of complications during pregnancy and in the year postpartum.[132]

---

[130] Brief of American College of Obstetricians and Gynecologists, American Medical Association, American Academy of Family Physicians, American College of Physicians, and Society for Maternal-Fetal Medicine as Amicus Curiae Supporting Appellees at 3, Daniel Cameron v. EMW Women's Surgical Center, P.S.C., et al.

[131] Clots can move into the lungs and are sometimes fatal. If blood clots develop in the arteries, patients are at risk for having a heart attack or stroke.

[132] *Pregnancy Mortality Surveillance System*, CTRS. FOR DISEASE CONTROL & PREVENTION (June 22, 2022),

Pregnancy also exacerbates pre-existing conditions, according to Dr. Bergin's testimony. If a patient who already has an underlying heart condition becomes pregnant, she is at increased risk for complications to occur during pregnancy. A third of patients with asthma may experience worsening of their condition during pregnancy which could worsen to the point where the patient needs to be admitted to the hospital. Pregnant patients with chronic kidney disease are at a higher risk of kidney failure, requiring dialysis during pregnancy or after delivery. Many other pre-existing conditions can be exacerbated by pregnancy including sickle cell disease, lupus, other collagen vascular diseases, substance use disorder, infectious diseases such as HIV or hepatitis, or even epilepsy. Some pre-existing conditions such as diabetes make life-threatening pregnancy issues like pre-eclampsia[133] more likely.

The process of childbirth also presents risks. The trial court heard testimony regarding these dangers. If a patient's water breaks before it is safe to deliver the baby, she is at increased risk of infection and sepsis. Such patients are also at risk for the placenta to separate from the wall of the uterus, causing bleeding and, potentially, fetal demise. Additional risks stemming from

---

https://www.cdc.gov/reproductivehealth/maternal-mortality/pregnancy-mortality-surveillance-system.htm?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Freproductivehealth%2Fmaternalinfanthealth%2Fpregnancy-mortality-surveillance-system.htm.

[133] Dr. Bergin elaborated that pre-eclampsia puts pregnant patients at risk for having seizures or stroke. It also puts patients at risk for retaining fluid on the lungs, making it difficult for patients to maintain their oxygen saturation and can put patients at risk for complications with their liver and renal function. *See also What are the risks of preeclampsia & eclampsia to the mother?*, NIH: Eunice Kennedy Shriver Nat'l Inst. of Child Health & Human Development (Nov. 19, 2018), https://www.nichd.nih.gov/health/topics/preeclampsia/conditioninfo/risk-mother.

70

labor and delivery include long term problems with bowel and bladder function, hemorrhage, peripartum cardiomyopathy (from which some people never recover), and postpartum depression.

More women die from pregnancy-related complications in the U.S. than in any other developed country.[134] The Centers for Disease Control and Prevention reports that nearly 700 women die each year in the U.S. from pregnancy or delivery complications.[135] In Kentucky, in 2018, the pregnancy-related mortality rate was 16.6 deaths per 100,000 live births.[136] For Black women specifically, the pregnancy-related mortality rate was 40.2 deaths per 100,000 live births.[137] Almost half of the pregnancy-related deaths in the United States are reported to be caused by hemorrhage, cardiovascular and coronary conditions, cardiomyopathy, or infection.[138] In Kentucky, pregnancy-related mortality will rise due to the practical effects of the statutes in question.

The complications and consequences of pregnancy are borne not only by those consenting to sexual activity. According to the Federal Bureau of

---

[134] Maternal mortality in the United States is double that of France, the developed nation with the second-highest rate. Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, COMM. FUND (Nov. 2020), https://doi.org/10.26099/411v-9255.

[135] *Maternal Mortality*, CTRS. FOR DISEASE CONTROL & PREVENTION (Sept. 16, 2022), https://www.cdc.gov/reproductivehealth/maternal-mortality/index.html#:~:text=The%20death%20of%20a%20woman,of%20pregnancy%20or%20delivery%20complications.

[136] KENTUCKY DEP'T FOR PUB. HEALTH, DIV. OF MATERNAL & CHILD HEALTH, Public Health Maternal Mortality Review – Annual Report 2021, (https://www.chfs.ky.gov/agencies/dph/dmch/Documents/MMRAnnualReport.pdf).

[137] *Id.* at 11.

[138] *Pregnancy Related Deaths*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2019), https://www.cdc.gov/vitalsigns/maternal-deaths/index.html.

Investigation Crime Data Explorer,[139] in Kentucky in 2021, there were 1,634 reported rape offenses. Of these, 642 of the victims were between the ages of 10 and 19.[140] Startlingly, 169 of the victims were nine years old or younger.[141] Even rape against individuals so young can result in pregnancy: Tragically, in 2021, one of the abortions performed in Kentucky was on a 9-year-old child. Given our criminal statutes, that pregnancy could only have been the result of a rape.[142]

Eight hundred eleven, or almost exactly half of the victims of reported rape offenses, were individuals aged 19 years or younger. At least some of these victims will become pregnant and will face the same associated risks not because of a choice that they made, but instead because of a heinous crime that was perpetrated against them. The statutes at issue do not even include an exception for victims of rape or incest. These young girls will be denied their constitutional rights to self-determination and the pursuit of safety.[143] Female children will be carrying pregnancies to term, despite any consequences.

---

[139] FEDERAL BUREAU OF INVESTIGATION CRIME DATA REPORTER, https://crime-data-explorer.fr.cloud.gov/pages/explorer/crime/crime-trend (last visited Dec. 15, 2022).

[140] *Id.*

[141] *Id.*

[142] Al Cross, *With no exceptions for rape or incest, Kentucky's near-total abortion ban can force children as young as 9 to deliver a baby*, KY. HEALTH NEWS (Sept. 9, 2022), https://ci.uky.edu/kentuckyhealthnews/2022/09/09/with-no-exceptions-for-rape-or-incest-kentuckys-near-total-abortion-ban-can-force-children-as-young-as-9-to-deliver-a-baby/.

[143] It is likely that the medical consequences and health risks of pregnancy will be even more numerous and more severe for young girls than they are for adult women. However, a sufficient record about these differences was not developed at the trial court, and I cannot assume such is true for the purposes of this analysis.

It is estimated that more than 80% of pregnancy-related deaths are preventable, given proper medical attention.[144] Accordingly, just as with any other life-threatening or severely life-altering situation in medicine, maternal care should require consultation and collaboration between the physician and the patient at risk. Under the statutes as-written, however, collaboration with a pregnant patient is impossible in potentially life threatening or severely life-altering situations. As I elaborate below, the statutes arguably strip a pregnant patient of her rights to self-determination and pursuit of safety, and in so doing, are not narrowly tailored to the interest of protecting human life.

The Attorney General (AG) argued that the Legislature avoided this problem by crafting exceptions to the restrictions on abortions for the life of the mother. The exceptions, however, are ignorant of the realities of pregnancy. I begin by addressing the most restrictive statute at issue.

The Human Life Protection Act (the trigger law) prohibits anyone from causing fetal death by way of the administration, prescription, or sale of drugs or by instrumental procedures. KRS 311.772(3)(a). Of note, the trigger law defines two exceptions to this blanket prohibition:

> (4) The following shall not be a violation of subsection (3) of this section:
> (a) For a licensed physician to perform a medical procedure necessary in reasonable medical judgment to prevent the death or substantial risk of death due to a physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of a pregnant woman. However, the physician shall make reasonable

---

[144] *Four in 5 pregnancy-related deaths in the U.S. are preventable*, CTRS. FOR DISEASE CONTROL & PREVENTION (Sept. 19, 2022), https://www.cdc.gov/media/releases/2022/p0919-pregnancy-related-deaths.html.

medical efforts under the circumstances to preserve both the life of the mother and the life of the unborn human being in a manner consistent with reasonable medical practice; or

      (b) Medical treatment provided to the mother by a licensed physician which results in the accidental or unintentional injury or death to the unborn human being.

KRS 311.772(4). At first blush, these exceptions seem meaningful. They are, however, empty. At the very least, even if these exceptions work in life-threatening circumstances, they still put *all medical decisions and the power to pursue the pregnant patient's safety* solely in the hands of the physician; the patient will play no part. In any other medical setting, a competent non-pregnant person, man, woman, and even child (in the absence of a parent or guardian), in a state of medical distress may collaborate with physicians to direct their treatment. However, a woman in a state of pregnancy has no right to direct her treatment even when life and death are on the line.

The statutes at issue today strip a pregnant patient's right to determine the course of her healthcare and treatment by criminalizing a medical procedure sometimes necessary to save the life of the woman. As a constitutional matter, the statutes' exceptions do not save them from scrutiny: Even the exceptions to the statutes arguably strip a pregnant patient of her constitutional rights.

These exceptions do not save the trigger law from violating its own intent to protect life. Instead, they show how broadly tailored the trigger law is to the Legislature's purpose. The trigger law cannot be narrowly tailored to the state's interest in preserving life if it is so broad as to work *against* that interest. I

74

acknowledge the extremely difficult task of balancing the interests in preserving maternal versus fetal life.

I further acknowledge the role the Legislature rightfully plays in drafting laws regarding these issues on behalf of their constituents. However, the exceptions threaten life by taking healthcare decisions out of the hands of both women and medical professionals and putting life-saving decisions into the hands of the AG. The danger of doing so is demonstrated in real life medical scenarios playing out across the Commonwealth.

For example, an extremely ill pregnant person presents for treatment, and upon examination, a physician determines that the woman is in shock from sepsis, meaning that an infection has reached her bloodstream. Sepsis is "a major cause for the admission of pregnant women to the intensive care unit and is one of the leading causes of maternal morbidity and mortality."[145] Septic shock has a mortality range of 40%–70%.[146]

The physician in our example may not know exactly when the patient became septic, and because of this, the physician may have anywhere from mere minutes to hours to save the pregnant woman. Maternal sepsis can lead

---

[145] Shang-Rong Fan et al., *New Concept and Management for Sepsis in Pregnancy and the Puerperium*, 2 MATERNAL FETAL MED. 231, 231 (Oct. 2020), https://journals.lww.com/mfm/fulltext/2020/10000/new_concept_and_management_for_sepsis_in_pregnancy.7.aspx.

[146] *Id.*

to tragic outcomes for the fetus as well.[147] If the infection is severe, even treatment of the mother's sepsis may not prevent these outcomes.

Members of the American Medical Association (AMA) discussed such an impact at the association's November 2022 interim meeting.[148] In his address, AMA President Dr. Jack Resneck recounted "stories about patients with ectopic pregnancies, sepsis, or bleeding after incomplete miscarriages, or cancers during pregnancy" being denied help by fearful physicians.[149] Poignantly, he lamented,

> I never imagined colleagues would find themselves tracking down hospital attorneys before performing urgent abortions, when minutes count, asking if a 30 percent chance of maternal death or impending renal failure meet the criteria for a state's exemptions or whether they must wait a while, a while longer, until their pregnant patient gets even sicker.[150]

Not only is this antithetical to the physician's Hippocratic Oath,[151] but it also violates long-established obstetric and gynecologic standards of medical care.

---

[147] Maternal sepsis can lead to "(1) preterm premature rupture of membranes or preterm labor or birth, (2) cerebral white matter damage or cerebral palsy or neurodevelopmental delay, (3) stillbirth, (4) early- or late-onset sepsis [for the fetus itself], and (5) perinatal death." *Id.*

[148] Dr. Jack Resneck, President, Am. Med. Ass'n, Address of the President to the House of Delegates (November 12, 2022).

[149] *Id.*

[150] *Id.*

[151] The Hippocratic Oath is an oath taken by physicians requiring, amongst other things, that physicians do no harm to patients and "apply, for the benefit of the sick, all measures . . . required" to heal. Peter Tyson, *The Hippocratic Oath Today*, PBS: NOVA (March 27, 2001), https://www.pbs.org/wgbh/nova/article/hippocratic-oath-today/.

The patient may not be consulted under the language of the statute, as discussed above. She cannot determine her own fate. Under the trigger law, a "physician shall make reasonable medical efforts under the circumstances to preserve both the life of the mother and the life of the unborn human being." KRS 311.772(4)(a). But what is reasonable? Does the physician use probabilities of the likelihood of survival to make a call? With a range as a survival rate, should the physician assume the best, a 40% mortality rate, or the worst, 70%? Would either be enough to constitute a "substantial risk of death" for the purposes of the statute? A mother, again, cannot weigh in on this decision.

What should be the woman's decision has been thrust solely into the hands of medical providers whose hands are tied by the threat of prosecution and the ambiguity within the statutes' exceptions. However, the AG asserts that physicians may rely upon guidance from his office in navigating a woman's care. Thus, additionally, a woman's ability to determine how to pursue her own safety has been supplanted by the AG's authority.

In exerting his authority, the AG asks physicians to ignore their training. He instead requires physicians to rely on his "medical" advice, grounded in neither medical training nor experience, in executing the purpose of the trigger statute at issue in this case.[152] Even if advice from legal counsel or from the

_____

[152] *Opinions of the Attorney General*, ATTORNEY GENERAL DANIEL CAMERON, https://www.ag.ky.gov/Resources/Opinions/Pages/default.aspx ("Pursuant to Kentucky Revised Statutes (KRS) Chapter 15.025, the Attorney General provides legal opinions to public officials to assist them in the performance of their duties. When

AG's office was reliable, being forced to seek such advice is still unconscionable and impractical. While the physician wastes time with his legal team, the patient loses precious minutes of life. Each moment that passes increases the threat to the patient's survival. While pregnant women bleed out on the table, alone and untreated, an attorney will be called. This callousness is unforgivable in the modern medical era.

In addition to the AG's supposed on-call advice, his office has provided guidance online regarding the use of the above statutory exceptions in the form of advisories. The AG's advisories do not constitute official guidance.[153] They are informal and in no way promise that even physicians who follow them will be spared from prosecution. Regardless, the first advisory's alleged guidance merely reiterates the exception, and the second advisory only discusses two life-threatening pregnancy-related crises: ectopic pregnancy, and pre-eclampsia.[154] They fail to instruct at all on the host of other pregnancy-related health concerns that can, and often do, arise.

---

special circumstances exist, the Attorney General may provide opinions to members of the general public on issues of significant public interest.").

[153] According to the AG's website, "Opinions of the Attorney General (OAGs) do not have the force of law, but they are persuasive and public officials are expected to follow them." However, the AG's guidance regarding the exceptions under the Human Life Protection Act is found within the category *advisories*, not the formal opinions described above that carry persuasive power with public officials. It is unclear whether these advisories fall under "advice letters," which are "not published and do not receive the same detailed review as OAGs. *They are not considered legal authority and should not be cited.*" An advisory is not a formal opinion, and at best, falls between OAGs and advice letters.

[154] The AG issued an advisory on October 26, 2022, titled, "Human Life Protection Act Second Advisory." This advisory includes:

Although the AG's advisories provide limited guidance on reproductive care for the two conditions noted above, the AG's advice is called into question by his other official statements regarding reproductive healthcare. The AG states on his official government website, "Science is supporting what we have always known to be true, what scripture tells us is true, that the unborn are human lives, just like yours and mine."[155] His site notes how the AG has "repeatedly defended" statutes prohibiting abortions.[156] It states that "in the battle to protect the unborn," the AG "stands on the frontlines of the fight" and

---

> Does the Human Life Protection Act prohibit removing an ectopic pregnancy?
>
> No. As a general matter, the removal of an ectopic pregnancy is not an abortion. See KRS 311.821(1)(c). Additionally, because removing an ectopic pregnancy is necessary to prevent a substantial risk of death or a serious, permanent impairment of a life-sustaining organ, physicians exercising their reasonable medical judgment can remove an ectopic pregnancy. See KRS 311.772(4)(a).
>
> Does the Human Life Protection Act prohibit a physician from treating a life-threatening condition such as preeclampsia?
>
> No. The health exception in the Human Life Protection Act allows physicians to use their reasonable medical judgment to treat life-threatening conditions, such as preeclampsia. Physicians can use their reasonable medical judgment to perform an abortion when necessary to prevent death, a substantial risk of death due to a physical condition, or serious, permanent impairment of a life-sustaining organ. KRS 311.772(4)(a).

*Human Life Protection Act Second Advisory*, ATTORNEY GENERAL DANIEL CAMERON (Oct. 26, 2022), https://www.ag.ky.gov/Advisories/22.10.26%20Second%20Advisory%20on%20Human%20Life%20Protection%20Act.pdf.

[155] *Protecting Life*, ATTORNEY GENERAL DANIEL CAMERON: PRIORITIES, https://www.ag.ky.gov/Priorities/Protecting-Life/Pages/default.aspx. An advisory is not a formal opinion, and at best, falls between OAGs and advice letters.

[156] *Id.*

"works tirelessly to protect the sanctity of life."[157] I wish to emphasize that the AG is entitled to his personal position on these issues and is entitled to proclaim that position publicly. However, physicians are not remiss to question whether an AG who has made such public proclamations, no matter how well-intentioned they might be, would forgive any fetal death, especially when the lines of reasonable necessity are so unclear. Further, one would conclude and expect that this stanch position could color and permeate the aforementioned advisories upon which the AG instructs physicians to rely.

In the midst of this confusion, physicians in medical emergencies involving a pregnant patient are at a stalemate. Do they save themselves from suffering criminal prosecution; or do they do what they have dedicated their lives to doing: providing standard of care, collaborative, and compassionate treatment to patients in need?[158] Physicians may not have enough time to untangle this dilemma when a pregnant patient's life is on the line.

EMW has presented a substantial question that the trigger law is not narrowly tailored to "protecting life." Instead, by taking away the agency of both a mother and her physician, it puts life at a substantial risk.

The six-week ban's exception is similarly vague, although it does not pit the life of the mother against the life of the fetus. That exception states that the threat of criminal prosecution does not apply to a physician who "performs a

---

[157] *Id.*

[158] Physicians have an "ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others." AM. MED. ASS'N, *Patient-Physician Relationships, Code of Medical Ethics Opinion* 1.1.1.

medical procedure that, in the physician's reasonable medical judgment, is designed or intended to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman." KRS § 311.7706(2). The statute requires the physician to "[d]eclare that the medical procedure is necessary . . . to prevent" the stated risks. *Id.*

As with the trigger law, this statute's exception still deprives a pregnant woman of her ability to collaborate with her physician regarding her medical treatment. It relegates all decision-making authority to the physician regarding care, and physicians still must rely on legal advice to determine medical necessity and risk of prosecution. This uncertainty clearly impacts and threatens the life of the patient for the reasons stated above. I acknowledge, however, that because a physician need not try on the face of the exception to make all attempts to save both the woman and fetus, the exception is more narrowly tailored than that within the trigger law. The issue nonetheless presents a substantial question on the merits of the underlying case. *Maupin*, 575 S.W.2d at 699. Additionally, the two exceptions were never differentiated before the trial court, and so I must assume the testimony admitted regarding the effect of the six-week ban as it relates to health outcomes and medical decision-making is similarly broad.

### FIRST-PARTY HARM TO PHYSICIANS

Having discussed the merits of the injunction, I now briefly touch on the effects of these bans on physicians and their profession. Although I concur

with the Majority's holding that the physicians have first-party standing to assert their claims, I believe that the physicians suffer more than merely economic harms.

First, physicians' liberty is threatened by the statutes at issue. A violation of either statute is a class D felony. KRS 311.772; KRS 311.7706. In Kentucky, class D felonies carry a penalty of one to five years in prison. KRS 532.060. Under these statutes, even when physicians act in good faith, their decisions can be questioned, and their freedom is at risk. The physician's choice will affect not only his or her patient, but his or her own liberty, since violating the trigger law will likely result in criminal prosecution.

Second, these statutes harm the practice of medicine on the whole. As discussed above, physicians are put in the impossible position of adhering to their Hippocratic Oath, the standard of care, and the requirements of the statutes at the same time.

When presented with this problem, counsel for the AG opined that a physician in such a situation should call their legal counsel (as noted by the AMA President), or even the AG's office itself, for advice. But as knowledgeable and professional as those resources may purport to be, they lack important credentials for dispensing medical advice—namely, a degree in medicine and approval by the Kentucky Board of Medical Licensure. By what authority can a lawyer, even the AG, tell a physician how best to treat a patient?

Third, these statutes likely threaten the Commonwealth's ability to recruit and retain obstetricians and gynecologists. The threats of harm to

82

physicians—including economic harm, threats to liberty, and the inability to put a patient's welfare first—will likely impact the Commonwealth's ability to attract and keep highly-qualified obstetricians and gynecologists within our state. This will negatively impact the health of the entire Commonwealth.

The above harms caused by the statutes at issue prevent medical institutions in the Commonwealth from providing necessary training to the next generation of physicians. Kentucky is on the precipice of a women's health crisis. Thus, the harms themselves will be perpetuated into the foreseeable future, absent intervention by the Legislature. The Legislature holds the exclusive power to avoid this eventuality, absent Constitutional infringements.

## CONCLUSION

Because the statutes infringe upon a pregnant patient's fundamental rights to pursue safety and to self-determination and are likely not sufficiently narrowly tailored to a compelling government interest, I would hold that EMG presented a substantial question on the merits of the case below.

This is not to say that any ban on abortion would offend the Constitution of Kentucky. As fetal life progresses, the weight of the state's interest necessarily grows. That shift will affect any constitutional analysis. Likewise, statutes with meaningful exceptions that do not infringe on a pregnant patient's constitutional rights in life-threatening or severely life-altering medical emergencies may render a statute sufficiently narrowly tailored to survive strict scrutiny. The six-week ban may, upon further testimony and judicial review, present such a case. This Court is not tasked with drawing

those lines at this time. The merits of the declaratory judgment action are still pending before the trial court.

For the reasons expressed herein, I would affirm the trial court's temporary injunction.

Bisig, J., joins.

***

NICKELL, J., CONCURRING IN PART AND DISSENTING IN PART:

I concur with the view that the trial court abused its discretion by enjoining the enforcement of the abortion bans. However, I respectfully dissent from any conclusion that Appellees have first-party standing or third-party standing to assert this *pre-enforcement* constitutional challenge. There should not be one set of procedural rules for abortion providers and another for everyone else.

Our recent unanimous decisions on constitutional standing categorically preclude this Court from reaching the merits of this pre-enforcement challenge despite the poignant countervailing considerations of urgent personal hardships and undisputed public importance. In particular, we recently refused to entertain pre-enforcement challenges to the death penalty and COVID-19 regulations, and likewise refused to allow medical providers to assert the privacy rights of their patients in the context of a pre-enforcement challenge to data collection laws. Appellees are not situated any differently than these other claimants. Moreover, pre-enforcement review is an inappropriate setting to determine the existence of previously unrecognized

84

constitutional rights. Therefore, Appellees' complaint should be dismissed in its entirety for lack of standing and the trial court erred in addressing the matter.

In concluding the instant appeal involving a pre-enforcement constitutional challenge presents neither the proper case nor procedural posture to exercise this Court's solemn authority of constitutional review, my position neither shrinks from nor otherwise casts a blind eye to the constitutional question of abortion because the unbiased eye of justice counsels there is no pre-enforcement constitutional question properly presented for review by this Court or any other lower court. Judicial restraint does not equate to judicial abdication.

Consistent application of the constitutionally mandated justiciability doctrine deprives this Court and the courts below of subject-matter jurisdiction to opine on the question of the right to abortion in advance of strict legal necessity. Undoubtedly, this matter will ultimately present itself, but in the appropriate legal context. Nevertheless, for the following reasons, I decline the invitation to express any opinion, whatsoever, on the underlying merits of the constitutional question, a matter concerning which I remain open to further persuasion.

### A. STANDING IS A THRESHOLD JURISDICTIONAL ISSUE

Resolution of the present appeal centers upon the justiciability doctrine of standing. Standing involves the determination of whether a party "is entitled to have the court decide the merits of the dispute or of particular issues."

*Sexton*, 566 S.W.3d at 193 (internal citation omitted). This Court has adopted the federal *Lujan* test to determine whether a party has standing. *Id.* at 196; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). We explained the test for constitutional standing in Kentucky as follows:

> [F]or a party to sue in Kentucky, the initiating party must have the requisite constitutional standing to do so, defined by three requirements: (1) injury, (2) causation, and (3) redressability. In other words, "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." "[A] litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent . . . ." "The injury must be . . . 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.'" "The injury must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision."

*Id.* (footnotes omitted). Because the standing requirements contained in the Kentucky Constitution mirror the standing requirements under the United States Constitution, federal decisions on standing may be accepted as persuasive authority. *Ward v. Westerfield*, 653 S.W.3d 48, 52 (Ky. 2022).

Ancient and universally accepted precedent establishes, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). However, in the very next line of that landmark opinion, United States Supreme Court Chief Justice John Marshall clarified, "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule." *Id.* The reference to "particular cases" means justiciable cases. More recently, in delivering the unanimous opinion of the United States Supreme Court, Chief Justice John Roberts

echoed and underscored his predecessor's declaration stating, "[i]n light of th[e] 'overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of [an] important dispute and to "settle" it for the sake of convenience and efficiency.'" *Hollingsworth v. Perry*, 570 U.S. 693, 704-05 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).

Likewise, Kentucky "courts do not function to give advisory opinions, even on important public issues, unless there is an actual case in controversy." *Philpot v. Patton*, 837 S.W.2d 491, 493 (Ky. 1992). Therefore, the issue of standing must be addressed as a threshold matter because "all Kentucky courts have the constitutional duty to ascertain the issue of constitutional standing, acting on their own motion, to ensure that only *justiciable causes* proceed in court, because the issue of constitutional standing is not waivable." *Commonwealth, Cabinet for Health & Fam. Services, Dept. for Medicaid Servs. v. Sexton ex rel. Appalachian Reg'l Healthcare, Inc.*, 566 S.W.3d 185, 192 (Ky. 2018).

The justiciability requirement operates as a constitutional limitation on the exercise of judicial power. *Id.* at 193. While the practical effect of the standing requirement is to avoid speculation and debate over abstract or hypothetical questions, the purpose of the doctrine is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The standing doctrine "serves to prevent the judicial process from being used to usurp the powers of

87

the political branches . . . and confines the . . . courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). Accordingly, "[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the . . . Government was unconstitutional." *Raines*, 521 U.S. at 819-20. The imposition of stringent standing requirements "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *United States v. Raines*, 362 U.S. 17, 22 (1960).

On review, a court must determine whether a party has established standing for "each separate claim asserted." *International Primate Protection League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). Each separate claim must be carefully scrutinized because "'standing is not dispensed in gross.'" *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734, (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996); alteration omitted). Further, standing is determined by the position of the parties at the outset of the litigation. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

### B. APPELLEES LACK FIRST-PARTY STANDING

There is no "unqualified right to *pre-enforcement* review of constitutional claims." *Whole Women's Health v. Jackson*, 142 S.Ct. 522, 538 (2021) (emphasis added). Appellees lack first-party standing to assert a pre-

enforcement challenge to the constitutionality of the abortion bans because there is no constitutional right to provide abortion. Similarly, Appellees are not entitled to assert pre-enforcement constitutional challenges based on alleged economic harms because state interference with normal business activity does not implicate a fundamental right. Thus, medical providers do not possess any automatic rights to challenge abortion regulations and speculative fears of prosecution are legally insufficient to confer standing. *Beshear v. Ridgeway Properties, LLC*, 647 S.W.3d 170, 176 (Ky. 2022).

As an exception to the general procedural rule, courts have relaxed the standing requirements to allow pre-enforcement challenges to vindicate expressive rights arising from the First Amendment of the United States Constitution because society, as a whole, is injured by the impermissible infringement of the right to free expression. *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). However, the same underlying societal basis is inapplicable to the present appeal.

Pre-enforcement review outside the First Amendment context involves the question of whether a statute infringes established fundamental rights as opposed to the question of whether a putative right exists by implication. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). For example, the United States Supreme Court has recognized the availability of pre-enforcement review in cases where a party has asserted the threatened infringement of the rights to property and free expression. *Id.* (citing *Terrace v. Thompson*, 263 U.S. 197 (1923) (property rights); *Village of Euclid v. Ambler*

89

*Realty Co.*, 272 U.S. 365 (1926) (property rights); *Ex parte Young*, 209 U.S. 123 (1908) (property rights); *Steffel v. Thompson*, 415 U.S. 452 (1974) (free speech rights)).  And, the Supreme Court has also cited *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967), for the proposition that certain administrative regulations are subject to pre-enforcement review.  *Id.*  However, the Supreme Court later clarified that pre-enforcement review of administrative regulations is limited to situations where the administrative action threatens to infringe established constitutional rights.  *Califano v. Sanders*, 430 U.S. 99, 109 (1977).  Thus, because Appellees have failed to demonstrate the possible infringement of a fundamental right, the relaxation of ordinary standing requirements is not justified in the present appeal.

Three recent decisions of this Court, all unanimous on the issue of standing, exemplify the general reluctance to allow pre-enforcement constitutional challenges outside the First Amendment context. *Commonwealth v. Bredhold*, 599 S.W.3d 409, 412 (Ky. 2020), *cert. denied sub nom. Diaz v. Kentucky*, 141 S.Ct. 1233 (2021); *Beshear v. Acree*, 615 S.W.3d 780, 828 (Ky. 2020); and *Ridgeway Properties*, 647 S.W.3d at 177.  In *Bredhold*, we refused to hear a pre-enforcement challenge to the constitutionality of the death penalty based on the established right against cruel and unusual punishment.  Similarly, in *Acree*, this Court refused to hear a pre-enforcement challenge to COVID-19 regulations based on the established right to property.  Finally, in *Ridgeway Properties*, we held the fear of

prosecution was legally insufficient to establish standing.  The reasoning of these decisions applies with equal force to the present appeal.

In *Bredhold*, the defendant was charged with capital murder.  At the outset of the case, the defendant moved to exclude the death penalty from the range of possible sentences on the ground that the execution of a person under the age of twenty-one violates the Eighth Amendment.  The trial court granted the motion and held the death penalty statute unconstitutional insofar as it permitted the executions of persons under twenty-one years of age.  The Commonwealth filed an interlocutory appeal.  We concluded the defendant lacked standing to raise a constitutional challenge prior to the actual imposition of the death penalty. *Bredhold* at 415.

Our analysis began with the proposition that standing requirements apply equally to facial constitutional challenges and as-applied challenges.  *Id.* We noted that Eighth Amendment challenges only ripen after sentencing because the state's power to punish does not arise until after a constitutionally sufficient guilty verdict is rendered.  *Id.*  We then explained the defendant failed to establish injury-in-fact:

> Thus, assuming conviction, the sentencing range for the Appellees would extend from a twenty (20) year-sentence to death.  To reiterate, the Appellees have yet to be tried, convicted, or sentenced.  *"It is just not possible for [the Appellees] to prove in advance that the judicial system will lead to any particular result in [their] case."*  With the Appellees having not yet suffered a concrete and particularized injury by having the death sentence imposed, no actual or imminent injury exists.  At this point, imposition of the death sentence can only be viewed as hypothetical.

*Id.* at 418 (emphasis added) (internal citation and footnotes omitted).

91

Our conclusion in *Bredhold* applies with equal force to the present appeal. Although Eighth Amendment challenges focus on the constitutionality of punishment as opposed to the constitutionality of a proscription on conduct, the import of the distinction recedes in light of this Court's general application of the *Bredhold* rationale to reject pre-enforcement challenges to COVID-19 regulations for lack of standing. *Acree*, 615 S.W.3d at 828; *Ridgeway Properties,* 647 S.W.3d at 176.

In *Acree*, three Kentucky business owners filed suit to challenge various executive orders in response to the COVID-19 pandemic, which affected their ability to reopen and operate their respective businesses. The business owners argued the executive orders:

> (1) violate Section 1 of the Kentucky Constitution, which protects the rights of life, liberty, pursuit of safety and happiness, and acquiring and protecting property; (2) are arbitrary, in violation of Section 2 of the Kentucky Constitution; (3) violate the separation of powers provisions in Sections 27 and 28 of the Kentucky Constitution; (4) exceed the Governor's statutory authority to act pursuant to KRS 39A.100; and (5) are illegal because they violate the procedures outlined in KRS Chapter 13A for the adoption of regulations.

*Id.* at 791. The Attorney General of Kentucky intervened and sought additional declarations regarding the unconstitutionality of the executive orders. The trial court determined two of the business owners were entitled to injunctive relief and entered a restraining order enjoining the enforcement of the executive orders pending a full hearing on the merits of a temporary injunction.

92

The Governor filed a petition for writ of mandamus in the Court of Appeals seeking to dissolve the restraining order and to prohibit the trial court from entertaining the motion for temporary injunction. The Court of Appeals consolidated the writ action with a separate action from another circuit, which had restrained the enforcement of certain executive orders. The Court of Appeals denied the Governor's motion for emergency relief and the merits of the writ action were set to be considered by a three-judge panel. Subsequently, the Governor filed a petition for writ of mandamus in this Court.

After determining the property rights enumerated in Sections 1 and 2 of the Kentucky Constitution do not constitute "fundamental rights," this Court rejected the business owners' pre-enforcement challenge for lack of standing. *Id.* at 816, 828. In doing so, we did not specify a precise definition for the term "fundamental right." Instead, we relied on established precedent to determine whether the right to property was fundamental. *Id.* Our approach to the determination of fundamental rights was consistent with the guidance of the United States Supreme Court in *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). There the Supreme Court defined fundamental rights as those which are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* The test for whether a right is implicit in the concept of ordered liberty is whether the right is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720-21 (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)).

93

We determined the business owners lacked standing because they failed to "identify any among themselves who has been threatened with a fine, fined, threatened with closure, or closed" pursuant to the COVID-19 regulations. *Acree*, 615 S.W.3d at 827. We held "because the Plaintiffs' injury is only hypothetical, they have failed to show the requisite injury for adjudication of their claim." *Id.* at 828. Further, citing *Bredhold*, we explained, "a declaration of rights is not available to the Plaintiffs" because "the Plaintiffs have not raised a case or controversy." *Id.* The term "case or controversy" originates in Article III, Section 2, Clause 1 of the United States Constitution and "is the lynchpin for all justiciability doctrines, including standing." *Sexton*, 566 S.W.3d at 195.

Subsequent to our decision in *Acree*, one of the business owners, who had been denied injunctive relief at the trial court level, filed an amended complaint seeking to uphold the constitutionality of new legislation curtailing the Governor's emergency powers and to enjoin the Governor from enforcing any measures contrary to the legislation. *Ridgeway Properties,* 647 S.W.3d at 174. The trial court entered a judgment declaring the legislation was constitutional and enjoined the Governor from enforcing any orders to the contrary. We accepted review on transfer from the Court of Appeals.

This Court again held the business owner lacked standing to assert a pre-enforcement challenge. *Id.* at 176. We concluded the owner failed to establish injury-in-fact because there was no evidence any action by the Governor interfered with the owner's operation of his business. *Id.* Again, we cited *Bredhold* for the proposition that allegations of future injury are

94

insufficient to establish standing and any threatened injury must be "certainly impending." *Id.* We held the fear of enforcement was a "speculative concern," which was "not legally sufficient" to establish standing. *Id.* Further, we discounted the owner's fear of future enforcement despite evidence the owner had been criminally charged for violating the Governor's previous mask mandate. *Id.*

With the foregoing standards in mind, each of Appellees' claims must be examined to determine whether Appellees have standing. In Count 1 of the complaint, Appellees assert "[b]y imposing a total prohibition on abortion, the Trigger Ban infringes Kentuckians' ability to decide to terminate a pregnancy, *in violation of Plaintiffs' patients' right to privacy* as guaranteed by Sections One and Two of the Kentucky Constitution." (Emphasis added). In Count 2, Appellees assert "[b]y imposing a total ban on abortion, the trigger ban infringes on Kentuckians' ability to decide to terminate a pregnancy, *in violation of Plaintiffs' patients' right to self-determination* as guaranteed by Sections One and Two of the Kentucky Constitution." (Emphasis added).

In Counts 1 and 2, Appellees have explicitly asserted the putative constitutional rights of third parties, who are not properly before this Court. We have previously recognized the rule "a party generally may assert only his or her own rights and cannot raise the claims of third parties not before the court." *Sexton,* 566 S.W.3d at 193; *Associated Industries of Kentucky v. Commonwealth*, 912 S.W.2d 947, 951 (Ky. 1995). There is no reason to depart

from this general rule in the present appeal.  Therefore, Appellees lack first-party standing with respect to Counts 1 and 2 of the complaint.

In Count 3, Appellees allege "[b]y leaving the future delineation of what conduct constitutes a crime in Kentucky in the hands of the U.S. Supreme Court the Trigger Ban improperly delegates the nondelegable legislative duty of the General Assembly to define the scope of Kentucky criminal law, in violation of Sections 27, 28, and 29 of the Kentucky Constitution."  In Count 4, Appellees alleged "[b]ecause the Trigger Ban takes effect only upon the approval of the authority of the United States Supreme Court and Kentucky's Attorney General, the Trigger Ban violates Section 60 of the Kentucky Constitution." However, Appellees fail to demonstrate the alleged violations of non-delegation and notice provisions infringe a fundamental right as recognized by Kentucky's history, traditions, and legal precedent.

The alleged existence of an unconstitutional statute, taken alone, is insufficient to justify the exercise of jurisdiction in a pre-enforcement suit. *Whole Women's Health*, 142 S.Ct. at 538.  In the pre-enforcement context, courts have "always required proof of a more concrete injury and compliance with traditional rules of equitable practice." *Id.*  The United States Supreme Court has "repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a . . . court." *Allen v. Wright*, 468 U.S. 737, 754 (1984).

Appellees have not identified the infringement of any personal fundamental right sufficient to justify pre-enforcement review.  Contrary to the

96

First Amendment pre-enforcement context, any infringement to the personal rights of Appellees is purely conjectural at this point, because there is no authority supporting their freestanding constitutional right to perform abortions. *Isaacson v. Mayes*, ___ F.Supp.3d ___, 2023 WL 315259 at *5 (D. Ariz. 2023).

In *Isaacson,* the United States District Court for the District of Arizona held that two doctors lacked standing to assert a pre-enforcement constitutional challenge to state abortion regulations. The District Court reasoned that, post-*Dobbs*, the performance of "elective abortions—does not satisfy the *pre-enforcement* standing test because the conduct is not arguably affected with constitutional interest." *Id.* (Emphasis added). In the absence of an established right to abortion, "the chilling effect the . . . [r]egulations have on doctors performing elective abortions is not the type of injury that can sustain a pre-enforcement vagueness claim." *Id.* The reasoning of the *Isaacson* decision is equally applicable to the present appeal.

Prior to *Dobbs,* a plurality of the United States Supreme Court rejected the notion that any putative constitutional right to abortion extends to a medical provider, stating:

> [w]hatever constitutional status the doctor-patient relation may have as a general matter, in the present context it is derivative of the woman's position. The doctor-patient relation does not underlie or override the two more general rights under which the abortion right is justified: the right to make family decisions and the right to physical autonomy. On its own, the doctor-patient relation here is entitled to the same solicitude it receives in other contexts.

97

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 844 (1992), overruled by *Dobbs*, 142 S.Ct. 2228 (2022).

The United States Court of Appeals for the Sixth Circuit thereafter reviewed abortion jurisprudence and determined providers have no personal right to perform abortions. *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 914 (6th Cir. 2019). The Court explained how the legal position of an abortion provider is merely derivative of a woman's position:

> But these decisions do not establish that the providers themselves have due process rights. Much to the contrary. *The premise of these challenges is that the providers have no constitutional rights of their own in this setting. Why else go through the rigmarole of granting the provider third-party standing to file the claim?* The first party (the woman) has the claim, and the third party (the provider) sometimes may bring that claim on her behalf. Any other interpretation of the third-party doctrine, as the plaintiffs use it here, would have this disfiguring effect: It would create a constitutional right for providers to offer abortion services and, in doing so, move the law perilously close to requiring States to subsidize abortions. Case law rejects both possibilities.

*Id.* (Emphasis added).

Other federal and state appellate courts have held similarly. The Ninth Circuit Court of Appeals refused to hear a pre-enforcement challenge to restrictions on a proprietor's right to sell firearms. *Teixeira v. County of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017). There, the proprietor argued the restrictions on his ability to sell firearms infringed upon both his and his customer's Second Amendment rights. In rejecting this argument, the Court likened the proprietor to abortion providers and commented "[n]ever has it been suggested . . . that if there were no burden on a woman's right to obtain

98

an abortion, medical providers could nonetheless assert an independent right to provide the service for pay." *Id.* And, relying on *Casey* and *Hodges*, the Supreme Court of Iowa has succinctly and correctly stated "any possible right a provider may have by way of performing the procedure is no more than derivative of a woman's personal rights." *Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37, 56 (Iowa 2021).

The merits of whether the Kentucky Constitution provides greater abortion rights protection for women than the United States Constitution remain to be determined, if not in the present case, another, but the test for standing to assert a pre-enforcement constitutional challenge is the same under both. Regrettably, the conclusion by a majority of this Court that abortion providers possess first-party standing to pursue due process protections relative to their own personal fundamental rights far exceeds the scope of any prior precedent. There is no principled reason to depart from the application of our holdings in *Bredhold*, *Acree*, and *Ridgeway Properties*, nor to ignore the clear import of the *Isaacson*, *Casey*, *Hodges*, *Teixeria*, and *Reynolds* decisions. Under the foregoing authority, determination or review of Appellees' pre-enforcement challenge to governmental limitations placed on the abortion providers' performance of abortions is unquestionably an inappropriate setting within which to decide whether they possess any personal and, as yet, unrecognized constitutional right.

Additionally, pre-enforcement determination or review cannot be premised solely on an alleged interference with Appellees' general right to

99

practice medicine or alleged speculative economic damages arising from their inability to provide abortion. Claims involving the right to practice medicine and alleged economic injuries do not qualify for pre-enforcement review because they do not implicate a fundamental right. *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011). State interference with "normal business activity" simply does not justify pre-enforcement constitutional review. *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983)).

This Court has refused to allow similar economic considerations to support the standing of other Kentucky business owners who sought to raise a pre-enforcement challenge to COVID-19 regulations. *Acree*, 615 S.W.3d at 816. In determining the business owners lacked standing, we applied established precedent and recognized:

> The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited and the right to conduct a business, or to pursue a calling, may be conditioned.

*Id.* (quoting *Nebbia v. New York*, 291 U.S. 502, 527-28 (1934)). A consistent judicial voice demands that our clearly expressed rationale in *Acree* be communicated and applied equally relative to the present appeal.

The decision of the United States Supreme Court in *Craig v. Boren*, 429 U.S. 190 (1976) and its plurality decision in *Singleton v. Wulff*, 428 U.S. 106 (1976), are distinguishable and inapplicable to the present appeal. *Singleton*

premised its holding on the established right to abortion and the right to reimbursement from the government for abortions performed on Medicaid recipients. Following *Dobbs*, neither of these conditions currently exist. Further, *Craig* premised its holding on the assertion of the established right to equal protection and economic harm arising from the inability to sell beer. By contrast, the present appeal does not involve the straightforward application of a well-established constitutional right. Instead, the question is whether the silent text of the Kentucky Constitution implies a right to abortion. Further, a medical provider cannot premise standing merely on alleged economic injuries because the regulation of the practice of medicine is inherently different from the regulation of generalized, non-health-related commercial pursuits.

In *Singleton*, a plurality of the United States Supreme Court held two abortion providers had first-person standing to challenge a regulation prohibiting Medicaid funding for elective abortions. The state had refused to reimburse the abortion providers for abortions already provided to Medicaid recipients, and the abortion providers anticipated future denials of compensation while alleging the statute infringed on their ability to practice medicine.

The plurality did not address the abortion providers' claims of future injury or whether the abortion providers had a right to practice medicine. Instead, the plurality based its holding on past economic injury and stated "[i]f the physicians prevail in their suit to remove this limitation, they will benefit, for they will then receive payment for the abortions." *Singleton*, 428 U.S. at

113. Moreover, the *Singleton* holding is inapplicable to the present appeal because, at the time it was decided, the abortion providers were operating in a legal environment where a woman's right to obtain an abortion was established by federal caselaw and the abortion providers were seeking reimbursement from the government for services already performed. Further, the *Singleton* plurality's premise that abortion providers suffer an injury-in-fact from the denial of government funding is completely untenable at present because subsequent decisions of the United States Supreme Court conclusively established the right to abortion does not include the right to receive government funding for abortion. *See, e.g.*, *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 508-13 (1989) (holding governmental refusal to fund abortions did not violate *Roe v. Wade*); *Harris v. McRae*, 448 U.S. 297, 325 (1980) (upholding the most restrictive version of the Hyde Amendment, Pub. L. No. 96-123, § 109, 93 Stat. 923, 926 (1979)). Therefore, *Singleton* is inapplicable to the present appeal.

In *Craig*, the United States Supreme Court held a beer vendor had standing to challenge a statute, on equal protection grounds, prohibiting the sale of 3.2% alcohol beer to males under the age of 21 and to females under the age of 18. Notably, unlike the present appeal, the Supreme Court was not confronted with the question of whether the vendor's right to equal protection of the law actually existed. The Supreme Court concluded the vendor had first-party standing because the statute inflicted "a direct economic injury through the constriction of her buyers' market." *Craig*, 429 U.S. at 194. By contrast,

102

standing cannot be premised in the present appeal merely on an alleged economic injury because the practice of medicine is subject to complex and heightened regulation under the Commonwealth's police power.

Indeed, Kentucky caselaw has long held there is "no inherent right to practice medicine or surgery, or to function in any of its branches free from the right of the legislature under its police power to enact necessary and reasonable regulations[.]" *Reynolds v. Walz*, 278 Ky. 309, 128 S.W.2d 734, 735 (1939). The state may legitimately impose restrictions on a medical practice that might not be tolerable in connection with purely commercial ventures. *Id.* Additionally, the fact that Appellees were allowed to provide abortion services in the past does not elevate such circumstance to a fundamental right or otherwise preclude the General Assembly from changing the law because a state has the authority to regulate the practice of medicine beyond initial licensure. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). The state's heightened power to regulate the practice of medicine is commensurate with the importance of the medical profession to society. *Id.* Few professions require the knowledge, skill, and care possessed by medical doctors. *Id.* Indeed, the physician must "deal with all those subtle and mysterious influences upon which health and life depend, and requires not only a knowledge of the properties of vegetable and mineral substances, but of the human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind." *Id.* Nevertheless, "there is no right to

practice medicine which is not subordinate to the police power of the states." *Lambert v. Yellowley*, 272 U.S. 581, 598 (1926).

Further, there is no mandate that state legislatures uniformly regulate medical procedures. *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955). States "may select one phase of one field and apply a remedy there, neglecting the others." *Id.* Legislative choice "may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). States have "broad latitude" to regulate doctors, "even if an objective assessment might suggest that" the regulation is not medically necessary. *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (quotation marks and emphasis omitted).

In any event, to be clear, the absence of a federal right to provide abortion does not necessarily foreclose the existence of such a right under the Kentucky Constitution, though I express no opinion regarding that question in the current context. However, in the present appeal, and based on the foregoing legal discussion relative to the practice of medicine and surgery, the alleged infringement of a doubtful and unspecified personal right to provide abortion compels the conclusion that these particular claims remain too abstract and conjectural to warrant pre-enforcement review.

In Count 5, Appellees alleged their due process rights were violated because KRS 311.772 failed to provide sufficient notice of its effective date. Specifically, Appellees alleged:

104

> The language of the Trigger Ban leaves it unclear whether it is now in effect, or will go into effect on July 19, 2022, when the mandate issues. Because of the criminal penalties for violating the Trigger Ban, Plaintiffs have been forced to stop providing abortion entirely, even though it is not clear whether the law is actually yet in effect.
>
> By imposing serious criminal and licensure penalties while failing to give Plaintiffs fair notice of whether the abortion ban takes effect before or after the Supreme Court's mandate issues, the Trigger Ban violates Plaintiffs' right to due process as guaranteed by Section 2 of the Kentucky Constitution.

(Paragraph enumeration omitted). Similarly, in Count 6, Appellees further alleged the trigger ban was unconstitutionally unintelligible in violation of Sections 27, 28, and 29 of the Kentucky Constitution for failing to define the point in time at which the ban would become enforceable. Regardless, however, by Appellees' own allegations, the vagueness and unintelligibility challenges centered on whether the trigger ban took effect on, or before, July 19, 2022, a date now well in the past, leaving no doubt as to the statute's effectiveness and rendering the question moot.

Dismissal of an appeal is required "when a change in circumstance renders that court unable to grant meaningful relief to either party." *Med. Vision Grp., P.S.C. v. Philpot*, 261 S.W.3d 485, 491 (Ky. 2008). Moreover, this Court has repeatedly held Kentucky courts have "no jurisdiction to decide issues which do not derive from an actual case or controversy." *Commonwealth v. Hughes*, 873 S.W.2d 828, 829 (Ky. 1994). Therefore, Counts 5 and 6 of the complaint must be dismissed as moot.

In Counts 7 and 8, Appellees explicitly assert the fetal heartbeat ban violates Appellees' patients' right to privacy and self-determination. Again,

105

however, we generally do not allow a plaintiff to assert the rights of third parties who are not properly before the Court. *Sexton*, 566 S.W.3d at 193. Therefore, absent any compelling reason to disregard the general rule, Appellees lack standing to assert Counts 7 and 8 of the complaint.

Finally, Count 9 of the complaint asserts a claim for injunctive relief while Count 10 asserts a claim for declaratory judgment. It is well-settled, injunctive relief under CR 65 is "an extraordinary equitable remedy" and may not be raised as a standalone cause of action. *Commonwealth v. Mountain Truckers Ass'n, Inc.*, 683 S.W.2d 260, 263 (Ky. App. 1984). A claim for injunctive relief is not a standalone cause of action. *Id.* Likewise, the declaratory judgment is a form of relief and not a standalone cause of action. *Maas v. Maas*, 305 Ky. 490, 204 S.W.2d 798, 800 (1947). Thus, because the substantive claims in Counts 1-8 of the complaint are not justiciable, Appellees lack standing to seek injunctive and declaratory relief under Counts 9 and 10.

## C. APPELLEES ALSO LACK THIRD-PARTY STANDING

Appellees have also failed to establish third-party standing. The prohibition on third-party standing is "designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig*, 429 U.S. at 193. Third-party standing doctrine has been termed "prudential," which signifies "judicially self-imposed limits" on the exercise of jurisdiction. *Allen*, 468 U.S. at 751. However, courts have not always clearly distinguished between judicial rules of self-restraint

106

and constitutional limitations on the exercise of jurisdiction.[159] *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). In any event, regardless of whether the procedural rule is deemed constitutional or merely prudential, Appellees are not entitled to assert claims belonging to their patients.

Importantly, in order for a party to establish third-party standing to represent the interests of a non-party, the party must initially establish first-party standing in his or her own right. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Further, once first-party standing has been established, the party may acquire third-party standing on behalf of another only if the party can *additionally* establish: (1) a close relationship with the actual possessor of the right to be asserted; and (2) a genuine obstacle "to the possessor's ability to protect his own interests." *Id.* In the present appeal, because Appellees failed to establish first-party standing to assert any of the claims raised in their complaint, they are precluded from asserting third-party standing to pursue

---

[159] The United States Supreme Court has begun to eliminate the distinction between constitutional and prudential standing doctrines in favor of treating all questions of standing as constitutional in nature. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014). However, the Supreme Court noted, "[t]he limitations on third-party standing are harder to classify." *Id.* Because third-party standing was not at issue in *Lexmark*, "consideration of that doctrine's proper place in the standing firmament can await another day." *Id.*

The "prudential" label for third-party standing analysis has been attributed to a separate concurring opinion authored by Justice Brandeis. *See June Medical*, 140 S.Ct. at 2143 (Thomas, J., dissenting) (citing *Ashwander v. TVA*, 297 U.S. 288, 346-348 (1936) (Brandeis, J., concurring)). However, Justice Brandeis did not specifically address the issue of third-party standing in his concurrence. *Ashwander*, 297 U.S. at 348 (Brandeis, J., concurring). Instead, he merely repeated the longstanding principle declaring, "[t]he Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation." *Id.*

the rights of their patients without consideration of whether they meet the latter two requirements.

This Court previously rejected a claim of third-party standing where medical providers attempted to assert the privacy rights of their patients under the Kentucky Constitution. *Yeoman v. Commonwealth, Health Policy Bd.*, 983 S.W.2d 459, 473 (Ky. 1998). In *Yeoman,* this Court held a group of physicians lacked standing to challenge a proposed statute, 1994 Kentucky Laws Ch. 512 (H.B. 250), which authorized the collection, analysis, and dissemination of certain medical data that the physicians alleged violated their patients' rights to privacy. *Id.* We held the threshold requirement of standing had not been met because the physicians failed to demonstrate "that their own privacy rights have been violated." *Id.* The alleged injury to the patients' right to privacy was held too attenuated to support the standing of the physicians. *Id.* In contrast, however, we concluded an actual patient had standing to challenge the proposed data collection law. *Id.* The rationale announced by this Court in *Yeoman* applies correspondingly to the present appeal and forecloses Appellees' claim of third-party standing.

Moreover, longstanding federal caselaw pertaining to third-party standing can no longer negate the applicability of our *Yeoman* decision to the present appeal nor provide support for the carving of an exception relative to abortion providers. Indeed, the recent *Dobbs* decision has undermined the foundational rationale of prior federal decisions on the third-party standing of abortion providers to the extent these decisions may no longer be relied upon

108

as persuasive authority. Thus, casual disregard of the *Dobbs* majority's criticism of the United States Supreme Court's prior application of third-party standing in the abortion context is unwarranted and ill-advised because such criticism was integral to *Dobbs*' holding that *Roe* and *Casey* must be overruled.

Under settled principles of stare decisis, "the mere erroneousness of a prior line of precedent is generally not sufficient to overturn it." Bryan A. Garner, et al., *The Law of Judicial Precedent* 391 (2016). Indeed, "even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some special justification." *United States v. International Business Machines Corp.*, 517 U.S. 843, 856 (1996) (internal quotations omitted). The United States Supreme Court developed a framework of five factors to be considered when deciding whether a precedent should be overruled: (1) the nature of its error; (2) the quality of its reasoning; (3) the "workability" of the rules it imposed on the country; (4) its disruptive effect on other areas of the law; and (5) the absence of concrete reliance. *Dobbs*, 142 S.Ct. at 2265.

Importantly, the *Dobbs* majority criticized the United States Supreme Court's prior abortion decisions as having "ignored the Court's third-party standing doctrine." 142 S.Ct. at 2276. In denouncing the high Court's prior disregard of general third-party requirements, the *Dobbs* majority favorably cited to prior dissents on the issue of third-party standing for abortion providers. *Id.* n.61 (citing *June Medical*, 140 S.Ct. at 2167-68 (Alito, J., dissenting), *Id.* at 140 S.Ct. at 2173-74 (Gorsuch, J., dissenting), and *Whole*

109

*Woman's Health*, 579 U.S. at 632, n.1, (Thomas, J., dissenting)). Far from being a passing comment, the erroneous application of third-party standing doctrine in abortion cases was among the essential factors the majority cited as special justification for its decision to overrule *Roe* and *Casey*. *Id.* The *Dobbs* majority further stated, "*Roe* and *Casey* have led to the distortion of many important but unrelated legal doctrines, and that effect provides further support for overruling those decisions." *Id.*

My position that it was the intention of the *Dobbs* majority to standardize application of the third-party standing doctrine is supported by subsequent federal and state decisions. The Eleventh Circuit Court of Appeals has already recognized the import of the *Dobbs* decision beyond the existence of the right to abortion, declaring:

> Because we take the Supreme Court at its word, we must treat parties in cases concerning abortion the same as parties in any other context. And to the extent that this Court has distorted legal standards because of abortion, we can no longer engage in those abortion distortions in the light of a Supreme Court decision instructing us to cease doing so.

*SisterSong Women of Color Reproductive Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022).

Judge Bush of the Sixth Circuit also specifically observed, "*Dobbs* has since explicitly cast such precedents [on third-party standing] into grave doubt." *EMW Women's Surgical Center, P.S.C. v. Friedlander*, No. 19-5516, 2022 WL 2866607 (6th Cir. July 21, 2022) (Bush, J., concurring in part). In *Isaacson*, Judge Rayes stated, "[t]his Court is bound by the Supreme Court's

directives, and so to avoid engaging on remand in the same distortions *Dobbs* identified, the Court must carefully examine whether Plaintiffs may challenge the . . . [r]egulations facially and pre-enforcement, rather than as applied in an enforcement action." ___ F.Supp.3d ___, 2023 WL 315259 at *3.

Our sister states have also noted the implications of the *Dobbs* decision on third-party standing. The District Court of Appeal of Florida observed, "any former decision from the United States Supreme Court acknowledging such 'standing' of a party to advocate on behalf of a person not appearing in the case . . . is now in question." *State v. Planned Parenthood of Southwest and Central Florida*, 342 So.3d 863, 869 n.* (Fla. 1st DCA 2022).

Clearly, the *Dobbs* majority's specific criticism of the Supreme Court's prior third-party standing decisions was inextricably intertwined with the majority's central holding that *Roe* and *Casey* must be overruled. Again, though this Court is not bound by any federal decisions on standing, we have specifically adopted and applied federal standing doctrine to the extent that federal decisions should be respected as persuasive authority. Importantly, the restoration of traditional standing principles at the federal level dovetails with this Court's pre-existing standing precedents in *Yeoman*, *Bredhold*, *Acree*, and *Ridgeway Properties*.

Based on the foregoing, any holding that Appellees possess third-party standing to assert alleged, but as yet unrecognized, abortion rights under Kentucky's Constitution on behalf of their patients overlooks the perhaps inconvenient, but nonetheless unavoidable, truth that the *Dobbs* decision

111

represented a radical departure from prior abortion jurisprudence, in general, and with regard to third-party standing, in particular. The less than subtle suggestion by some hinting that Appellees join impacted patients to this litigation belies at least some doubt or concern regarding the abortion providers' legal authority and qualification to champion their patients' constitutional cause. Inviting the joinder of additional parties on remand would also seem to contravene long-established precedent holding, "[i]t is not the function of this Court to practice cases for litigants." *Allen v. Murphy*, 225 S.W.2d 23, 25 (Ky. 1953).

Even so, two arguments have been advanced to marginalize any impact of the *Dobbs* decision on prior third-party standing decisions. Neither argument has merit.

First, it has been suggested that if the *Dobbs* majority had truly intended to alter the landscape of third-party standing doctrine, then it should have seized the opportunity to address the issue more fully or otherwise have simply dismissed the appeal on standing grounds. However, the grant of certiorari in *Dobbs* was expressly limited to the single question, "whether all pre-viability prohibitions on elective abortions are unconstitutional." *Dobbs v. Jackson Women's Health Organization*, 141 S.Ct. 2619, 2620 (2021) (order granting petition for writ of certiorari); *Dobbs* Pet., No. 19-1392, 2020 WL 3317135 (U.S. June 15, 2020). The Supreme Court specifically declined to grant certiorari on the issue of third-party standing. *Id.*

112

The only meaning that may be ascribed to the denial of certiorari on third-party standing "is that fewer than four members of the Court thought it should be granted." *State of Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919 (1950). As Justice Frankfurter eloquently explained, "[w]ise adjudication has its own time for ripening," and "[i]t may be desirable to have different aspects of an issue further illumined by the lower courts." *Id.* at 918.

The *Dobbs* majority logically and consistently declined to dismiss the appeal on standing grounds. Under existing precedent, third-party standing requirements are prudential rather than jurisdictional; therefore, dismissal was not mandated and the denial of certiorari on the issue does not imply agreement with the lower court's decision. *Allen*, 468 U.S. at 751; *Baltimore Radio*, 338 U.S. at 918. And, as stated above, the majority's criticism of the prior third-party standing decisions was incorporated into *Dobbs*' central holding through the necessary stare decisis analysis.

Second, it is argued that the *Dobbs* majority's criticism of prior third-party standing decisions is mere dicta and its influence should be marginal because it does not carry binding precedential authority. However, though not binding authority, dicta may be "persuasive or entitled to respect" according to its reasoning and applicability and where "it was intended to lay down a controlling principle." *Cawood v. Hensley*, 247 S.W.2d 27, 29 (Ky. 1952).

The *Dobbs* majority's criticism of prior decisions pertaining to third-party standing, though noncompulsory, demands consideration because its substance communicated the thoughts of the concurring justices and was

113

deemed sufficiently important to have been included in the majority opinion. *Drake v. Johnson,* 3 Ky. 218, 231, 1808 WL 713 (1808) ("[i]t is true, these decisions are not binding authority upon us; but they certainly deserve our respect; especially that of the supreme court of the United States; as well on account of its being the highest tribunal of justice in the Union, as on account of the acknowledged learning of the judges.").

Moreover, while seeking to minimize criticism contained in the *Dobbs* dicta, the primary cases cited in support of determining third-party standing for the Appellee abortion providers are plurality opinions. However, neither dicta nor plurality opinions have binding precedential value. *Hudson v. Commonwealth,* 202 S.W.3d 17, 21 (Ky. 2006). Thus, logic demands a careful weighing of the *Dobbs* dicta and the pre-*Dobbs* plurality decisions, particularly because the *Dobbs* dicta was directly critical of the earlier opinions. In addition, the analytical impact of the previous plurality decisions is further negated because their holdings were based on a fundamental right to abortion under the United States Constitution which *Dobbs* extinguished.

In *June Medical,* a plurality of the United States Supreme Court held the state had waived its argument that abortion providers lacked third-party standing to challenge an abortion restriction. 140 S.Ct. 2103, 2118 (2020). In doing so, the plurality proceeded to string cite past decisions on third-party standing from a variety of contexts. *Id.* Particularly, the plurality cited to *Craig,* 429 U.S. at 195, for the proposition that threatened governmental

114

sanctions for non-compliance eliminated any risk the abortion providers' claims were hypothetical or speculative. *Id.* at 2119.

The cited *Craig* decision, in turn, largely premised its departure from the general prohibition on third-party standing upon the discredited holding of the *Singleton* plurality. 429 U.S. at 193-95. As previously noted, the *Craig* decision addressed the well-established right to equal protection of the law and harm stemming from a vendor's inability to sell beer to 18–20-year-old males. By contrast, the right to abortion is no longer well-established following the *Dobbs* decision, which precludes the availability of pre-enforcement review. Further, as has been already stated, this Court's standing analysis distinguishes between economic harms arising from purely commercial pursuits and those arising from the regulation of medical services. *See Reynolds,* 128 S.W.2d at 735.

The *June Medical* plurality also cited to *Singleton,* 428 U.S. at 112, yet another plurality opinion for the proposition that abortion providers are the "least awkward" and most "obvious" claimants because they "are far better positioned than their patients" to challenge the constitutionality of abortion restrictions. *June Medical,* 140 S.Ct. at 2119. However, the *June Medical* plurality's dependence upon the "least awkward" or most "obvious" claimant test announced in *Singleton* for third-party standing is inconsistent with the third-party standing requirements firmly established by the Supreme Court's majority in *Kowalski,* 543 U.S. at 130, as set forth above. For these reasons, *June Medical* lacks persuasive value on the issue of third-party standing.

115

Further, any notion that the *Singleton* plurality decision is representative of a settled history of recognizing the third-party standing of abortion providers is misplaced. As stated above, *Singleton's* "sweeping general statement of abortion provider standing and the specific applications of law to fact have never been adopted by a majority of the court." Stephen J. Wallace, *Why Third-Party Standing in Abortion Suits Deserves A Closer Look*, 84 Notre Dame L. Rev. 1369, 1397 (2009) (collecting cases). It cannot be overemphasized, the *Singleton* plurality premised first-party standing on the right to abortion and the attendant right to receive Medicaid reimbursement for abortion, neither of which conditions currently exist, post-*Dobbs*. Thus, *Singleton* can in no way be reasonably read to support Appellees having first-party standing. Further, as stated above, without first-party standing, Appellees cannot claim third-party standing. *Kowalski*, 543 U.S. at 130.

Even assuming first-party standing for the sake of argument, the *Singleton* plurality's application of the close relationship and genuine obstacle tests was speculative and internally inconsistent. After concluding women faced genuine obstacles in asserting their own rights, the *Singleton* plurality acknowledged "that these obstacles are not insurmountable," that women retained the ability to file suit under a pseudonym, and review under exceptions to the mootness doctrine likewise remained available. *Singleton*, 428 U.S. at 108. Therefore, the existence of a genuine obstacle to women asserting their own rights was correctly deemed "chimerical," that is, mythical and illusory. *Id.* at 126 (Powell, J., dissenting).

116

The *Singleton* plurality's analysis is further discredited in comparison to the more recent *Kowalski* case where a majority of the United States Supreme Court applied the test for third-party standing. In *Kowalski*, the Supreme Court addressed whether two defense attorneys could challenge a statute which prohibited the appointment of appellate counsel for indigent defendants who had pleaded guilty. The majority held the attorneys had failed to demonstrate a sufficiently close relationship because they had alleged only harm to future, hypothetical clients. *Kowalski*, 543 U.S. at 131. Regarding the genuine obstacle prong, the Supreme Court rejected the argument that indigent pro se criminal defendants could not adequately assert their own rights on appeal after citing cases involving pro se defendants who had actually done so. *Id.* at 132. Thus, the Supreme Court noted a bare alleged lack of valuable assistance did not qualify as the type of genuine obstacle necessary to allow a third-party to assert a non-party's rights. *Id.*

In the present matter, Appellees have failed to demonstrate their patients face a genuine obstacle to the assertion of their rights in Kentucky courts. In the appropriate case, Kentucky law permits a party to appear under a pseudonym. *Doe v. Coleman*, 497 S.W.3d 740, 752 (Ky. 2016); *Roe v. Clark*, 2017-SC-0256-MR, 2018 WL 1960823 at *1 (Ky. April 26, 2018); *Doe 1 v. Flores*, ___ S.W.3d ___, 2022 WL 4390880, at *3 (Ky. App. Sept. 23, 2022); *Doe v. Potter*, 225 S.W.3d 395, 397 (Ky. App. 2006); *Doe v. Golden & Waters, PLLC*, 173 S.W.3d 260, 263 n.8 (Ky. App. 2005). While there does not appear to be a reported Kentucky decision concerning the use of a pseudonym in an abortion

117

case, at the federal level, "interested women have challenged abortion regulations on their own behalf in case after case." *June Medical Services*, 140 S.Ct. at 2174 (Gorsuch, J., dissenting) (citing *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015); *Jane L. v. Bangerter*, 102 F.3d 1112 (10th Cir. 1996); *Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir. 1986)). Further, in the appropriate case, Kentucky law allows courts to apply the exception to the mootness doctrine. *Morgan v. Getter*, 441 S.W.3d 94, 100 (Ky. 2014). Moreover, the quality and extent of the constitutional challenges pursued by impoverished women over the course of the abortion debate belies any reasonable suggestion that their access to the courts of justice has been substantially impeded. Thus, the purported genuine obstacles to the ability of Appellees' patients to assert their own rights in Kentucky courts are likewise "chimerical," mythical, and illusory. Appellees' claim to third-party standing could be rejected on this basis alone.

Neither does *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976), merit precedential or persuasive effect for its supposed historical recognition of third-party standing for abortion providers. In *Danforth*, the United States Supreme Court cited *Doe v. Bolton*, 410 U.S. 179, 188 (1973), abrogated by *Dobbs*, 142 S.Ct. 2228, in support of its conclusion that "the physician-appellants clearly have standing" because the physician is the person against whom the statute directly operates. 428 U.S. at 62. The *Danforth* Court further quoted *Bolton* for the proposition that the abortion

providers "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.*

The *Bolton* decision cannot be read to support the independent standing of an abortion provider because "[t]he constitutional right vindicated in [*Bolton*] was the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference." *Whalen v. Roe*, 429 U.S. 589, 604 n.33 (1977). The Supreme Court explained, "[n]othing in that case [*Bolton*] suggests that a doctor's right to administer medical care has any greater strength than his patient's right to receive such care." *Id.* The Supreme Court explicitly recognized that the abortion regulations at issue in *Bolton* "would not have violated the Constitution" unless "those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision." *Id.*

The "direct operation" test, as applied by the *Danforth* and *Bolton* decisions, was premised on the assumption the abortion providers were seeking to vindicate a woman's established right to abortion. Once again, this assumption is no longer valid in the wake of *Dobbs*, and the assertion of an unrecognized constitutional right is insufficient to justify pre-enforcement review. This concept is neither new nor novel and harkens to our precedent. Appellees are in no different position than the claimants whose pre-enforcement challenges we refused to hear in *Yeoman, Bredhold, Acree,* and *Ridgeway Properties.* For the foregoing reasons, Appellees lack third-party standing and the complaint must be dismissed.

119

I would further emphasize that all of Appellees' claims involve facial pre-enforcement challenges, which are "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Moreover, facial challenges to the constitutionality of statutes are disfavored because they "often rest on speculation." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). Finally, pre-enforcement challenges to abortion regulations necessarily involve an "empirical inquiry," which "is precisely the sort of inquiry that is least suited for pre-enforcement challenges." *Memphis Center for Reproductive Health v. Slatery*, 14 F.4th 409, 455 (6th Cir. 2019) (Thapar, J., concurring in part, dissenting in part).

As Judge Thapar observed, "[u]nlike lawmakers who can continually reevaluate their findings through standing committees and incremental experimentation, judges hearing pre-enforcement challenges must make snap calls that begin with no evidence on the ground and end with a final judgment that is not easy to amend." *Id.* To demonstrate appropriate respect to legislative departments, particularly in light of constitutional limitations upon judicial authority, courts require something more than speculation to find standing. Yet, in this record, there is only speculation.

Further, it cannot be claimed that a lack of standing in this particular case unfairly insulates the abortion bans from judicial review because "[t]he assumption that if respondents have no standing to sue, no one would have

120

standing, is not a reason to find standing." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 420 (2013) (citation and internal quotation marks omitted). This Court has also previously stated that a party who lacks standing is not without recourse because judicial review is available should the party become subject to a non-speculative injury. *Acree*, 615 S.W.3d at 828. Ultimately, because standing doctrine implicates the separation of constitutional powers, "[i]t is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case." *Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990).

### D. TEMPORARY INJUNCTION WAS ABUSE OF DISCRETION

Appellees' lack of standing should end the discussion, requiring dismissal of Appellees' complaint. However, given the diverging views of this Court on the propriety of the temporary injunction, I am compelled to address the patent errors of the trial court's analysis. *See Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 171 (Ky. 2009). My analysis is limited to the propriety of the temporary injunction, and I take no position on the ultimate question of whether the Kentucky Constitution implies a right to abortion, remaining open to further persuasion in the proper case and context. Nothing herein should be construed to indicate otherwise. With that said, I am convinced the trial court failed to apply longstanding precedent to the question of whether Appellees were entitled to the issuance of a temporary injunction, invoking the power of judicial review while ignoring the well-established

121

standards governing its application. Therefore, the trial court abused its discretion.

Doubt counsels against both the issuance of a temporary injunction and the determination of a statute's unconstitutionality. CR 65.04 requires a party to "clearly" demonstrate the violation of a personal right and consequent irreparable injury before a temporary injunction will issue. Likewise, a statute should not be deemed invalid unless the constitutional violation is "clear, complete and unmistakable." *Kentucky Industrial Utility Customers, Inc. v. Kentucky Utilities Company*, 983 S.W.2d 493, 499 (Ky. 1998). Further, it is an abuse of discretion for a trial court to apply novel and unrecognized legal theories to support the issuance of a temporary injunction. *See Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 791 (8th Cir. 1995); *Cincinnati Bengals, Inc. v. Bergey*, 453 F.Supp. 129, 145 (S.D. Ohio 1974) ("where there are novel or complex issues of law or fact that have not been resolved a preliminary injunction should be denied.").

Our Civil Rules and well-established caselaw demand enhanced requirements for entitlement to a temporary injunction beyond those required to establish standing. *See Taylor v Resolution Trust Corp.*, 56 F.3d 1497, 1509 (D.C. Cir. 1995); *see also Maupin v. Stansbury*, 575 S.W.2d 695, 697 (Ky. App. 1978). CR 65.04 authorizes the issuance of a temporary injunction and states as follows:

> A temporary injunction may be granted during the pendency of an action on motion if *it is clearly shown* by verified complaint, affidavit, or other evidence that *the movant's rights* are being or will

be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss, or damage pending a final judgment in the action, or the acts of the adverse party will tend to render such final judgment ineffectual.

(Emphasis added). A party must satisfy a three-part test before a temporary injunction may be granted:

First, the trial court should determine whether plaintiff has complied with CR 65.04 by showing irreparable injury. This is a mandatory prerequisite to the issuance of any injunction. Secondly, the trial court should weigh the various equities involved. Although not an exclusive list, the court should consider such things as possible detriment to the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo. Finally, the complaint should be evaluated to see whether a substantial question has been presented.

*Maupin*, 575 S.W.2d at 699. A temporary injunction should issue "only where absolutely necessary to preserve a party's rights pending the trial of the merits." *Id.* at 698. Therefore, "[b]ecause a temporary injunction often has the effect of enforcing a mere claim of the right, doubtful cases should await trial of the merits." *Id.*

The power to enjoin the enforcement of statutes must be exercised with great caution because "courts will not, except under extraordinary circumstances, interfere with the duties of other departments of the government, equity will not ordinarily interfere with the action of public officers taken under statutory authorization." *Akers v. Floyd Co. Fiscal Court*, 556 S.W.2d 146, 149 (Ky. 1977) (quoting 42 Am.Jur.2d, Injunctions, § 186). A trial court must ensure the requirements for injunctive relief have been clearly satisfied because:

123

> The power thus to arrest the hand of an officer as he is about to carry out the command of the legislature is to be exercised with a wisdom and discretion commensurate with its greatness; no trivial grounds will be sufficient to authorize the granting of such extraordinary relief.

*Id.* When a party seeks to enjoin the enforcement of a duly enacted statute, the law requires the party to demonstrate, in addition to irreparable injury, "a likelihood of success on the merits rather than merely demonstrating sufficiently serious questions going to the merits." 42 Am.Jur.2d Injunctions § 168 (2022).

It is well-established that a trial court's decision to grant or deny a temporary injunction is reviewed for abuse of discretion. *Maupin*, 575 S.W.2d at 699. The test for abuse of discretion is whether the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000). While an appellate court must afford due deference to the findings of a trial court, we owe no deference to findings "occasioned by an erroneous application of the law." *Cameron v. Beshear*, 628 S.W.3d 61, 72 (Ky. 2021). The erroneous application of the law constitutes an abuse of discretion because such a decision is unsupported by sound legal principles. *Id.* With the foregoing standards in mind, it is necessary to examine each of the three *Maupin* factors in turn.

Under the first *Maupin* factor, the trial court abused its discretion by determining that Appellees demonstrated irreparable injury. An injury is irreparable if "there exists no certain pecuniary standard for the measurement

of the damages." *Cyprus Mountain Coal Corp. v. Brewer*, 828 S.W.2d 642, 645 (Ky. 1992). As with standing, irreparable injury must result from the "possible abrogation of a concrete *personal* right." *Id.* at 698. (Emphasis added).

The trial court based its finding of irreparable injury on the inability of unidentified, non-party patients to receive an abortion. The trial court also concluded that relief upon final judgment would be meaningless to "many people" (unidentified hypothetical non-parties) because they would be past gestational age requirements or would have been forced to carry their pregnancies to term. Despite the poignancy of these alleged injuries, such injuries simply do not result from an injury to the *personal* rights of Appellees because, as has already been noted, any possible constitutional rights an abortion provider may possess are merely derivative of a woman's right. *Hodges*, 917 F.3d at 914.

And, to the extent the trial court relied on any economic injuries incurred by Appellees, economic injuries are generally not irreparable under Kentucky law. *Norsworthy v. Kentucky Bd. of Medical Licensure*, 330 S.W.3d 58, 62 (Ky. 2009). Further, there is no inherent right to practice medicine free from regulation by the state. *Reynolds*, 128 S.W.2d at 735. The practice of medicine as a business is also subject to heightened regulation because a medical practice is fundamentally different from purely commercial pursuits. *Id.* Appellees' failure to demonstrate irreparable injury categorically precludes temporary injunctive relief.

Under the second *Maupin* factor, the trial court improperly balanced the equities by failing to consider governing law regarding: the harm to the public interest; the harm to the Commonwealth; and whether injunctive relief would alter the status quo. Regarding the public interest, the trial court concluded the denial of abortion services was detrimental to public health because "Plaintiffs assert, and this Court agrees, that abortion is a form of healthcare."

The trial court's conclusion was unsupported by sound legal principles because, although a person may enjoy a right to seek or reject medical treatment generally, there is no constitutional right to select a particular treatment or procedure over the rational objections of a governmental authority. *Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir. 1980). It is the prerogative of the General Assembly, not the courts or medical providers, to set public policy regarding matters affecting public health. *Cameron*, 628 S.W.3d at 73.

Regarding the harm to the Commonwealth, the trial court improperly discounted the legitimacy and extent of the Commonwealth's interest in enforcing the abortion bans. The trial court also ignored or overlooked applicable caselaw recognizing the Commonwealth's legitimate interest in the protection of unborn life. *Dobbs*, 142 S.Ct. at 2261. Instead, the trial court cited *Harrod v. Whaley*, 239 S.W.2d 480, 482 (Ky. 1951), to support its conclusion that the Commonwealth would suffer minimal, if any, harm from the issuance of a temporary injunction because "the state has no interest in enforcing an unconstitutional law." However, *Harrod* has no application to the

126

present appeal because the context of the *Harrod* decision involved a collateral attack on a final judgment of conviction. The Court stated:

> The office or purpose of the writ of habeas corpus is not to review errors committed in the trial. It is a collateral attack upon the judgment. It raises only the question whether the judgment under which the petitioner is confined is absolutely void. It may be void by reason of the omission of due process, want of jurisdiction of the court which tried him, and that in turn may be because the indictment did not charge the commission of a public offense as where there was no such offense cognizable in law or where the statute is unconstitutional, hence, is no law at all.

*Id.*

Clearly, the fact that a constitutional challenge is an appropriate subject for review on a petition for writ of habeas corpus following a final judgment of conviction simply does not justify a departure from the presumption of constitutionality and other rules governing the interpretation of statutes in the first instance. Further, on a motion for temporary injunction, the trial court could not conclude the statutes at issue are unconstitutional without ignoring the presumption of a statute's constitutionality and making a premature determination on the merits. The trial court also completely ignored the presumption that "non-enforcement of a duly-enacted statute constitutes irreparable harm to the public and the government." *Cameron*, 628 S.W.3d at 73. The reason underlying this presumption is a "statute's enactment constitutes an implied finding by the legislature that the public interest required it." *Id.* (citing *Boone Creek Props., LLC v. Lexington-Fayette Urb. Cnty. Bd. of Adjustment*, 442 S.W.3d 36, 40 (Ky. 2014)).

127

Regarding the issue of whether injunctive relief would alter the status quo, the trial court erroneously concluded that the issuance of a temporary injunction would "merely restore the status quo that has existed in Kentucky for fifty years." Presumably, the trial court was using the date of *Roe v. Wade* to mark the status quo in Kentucky prior to *Dobbs*. In a typical case between private parties, the status quo is the last uncontested status existing between the parties. However, a temporary injunction which prevents future injury necessarily alters the status quo. 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948 (3d. Ed. 2022) ("If preliminary relief is granted [to prevent future injury], defendant, by complying, would effect a change in the current situation."). By invalidating a legislative enactment, which, by definition, is taken in the public interest, the trial court provisionally granted the ultimate relief sought by Appellees in their complaint and, therefore, changed the status quo. *Id.*

Further, the trial court's use of *Roe* to mark the status quo was unsupported by sound legal principles because "a court is to apply the law in effect at the time it renders its decision." *Commonwealth v. Alexander*, 5 S.W.3d 104, 106 (Ky. 1999). At the time trial court issued the temporary injunction, *Roe* had been expressly overruled by *Dobbs* and was, thus, a legal nullity. The abortion bans which are the subject-matter of the present appeal were duly enacted by the General Assembly in 2019. Additionally, in 1982, the General Assembly enacted KRS 311.710(5) to declare the public policy of Kentucky in light of the *Roe* decision. KRS 311.710(5) states:

128

> It is the present intention of the General Assembly to protect the valid and compelling interests of the Commonwealth and its inhabitants without unduly burdening a woman's constitutional privacy rights as delineated by the courts. *If, however, the United States Constitution is amended or relevant judicial decisions are reversed or modified, the declared policy of this Commonwealth to recognize and to protect the lives of all human beings regardless of their degree of biological development shall be fully restored.*

(Emphasis added). Consequently, the years 2019 and 1982 are the operative dates concerning the status quo in Kentucky at the time *Dobbs* was decided. The temporary injunction did not preserve the status quo. Therefore, the trial court abused its discretion by failing to properly balance the equities in accordance with governing law.

Under the third and final *Maupin* factor, the trial court likewise abused its discretion by concluding Appellees demonstrated a substantial question on the merits of Appellees' constitutional challenges. In doing so, the trial court further erred by, sua sponte, injecting unraised constitutional claims. As with the standing analysis, it is necessary to address each of Appellees' substantive claims in turn before addressing claims improvidently raised by the trial court.

In Counts 1 and 2 of the complaint, Appellees asserted that the trigger ban infringed upon their patients' rights to privacy and self-determination in violation of Sections 1 and 2 of the Kentucky Constitution. Similarly, in Counts 7 and 8, Appellees asserted that the heartbeat ban violated their patients' rights to privacy and self-determination. The trial court abused its discretion by determining there is a substantial question on the merits of whether the abortion bans infringe upon the rights of privacy and self-determination.

129

The trial court's erroneous application of decisions involving the right to consensual sodomy and the right to refuse unwanted medical treatment hardly establishes a clear, complete, and unmistakable right to abortion. *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1992) (holding right to privacy implies right to engage in sodomy); *Woods v. Commonwealth*, 142 S.W.3d 24, 32 (Ky. 2004) (holding right to self-determination implies right to refuse unwanted medical treatment). The United States Supreme Court has consistently recognized the unique nature of abortion distinguishes it from other rights because abortion destroys a potential human life apart from the party making the choice, whereas consensual sodomy and the refusal of unwanted medical treatment do not. *See Dobbs*, 142 S.Ct. at 2258.

The *Casey* plurality further described abortion as "a unique act," which is "fraught with consequences for others." *Casey*, 505 U.S. at 852. The *Roe* Court also specifically distinguished abortion from "from marital intimacy, or bedroom possession of obscene material, or marriage, or procreation, or education." *Roe*, 410 U.S. at 159. Therefore, analogy to other rights fails to create a substantial question regarding the right to abortion.

The trial court's reliance on *Wasson* and *Woods* also ignored or overlooked relevant Kentucky precedent. In *Sasaki v. Commonwealth*, 485 S.W.2d 897, 902 (Ky. 1972), our predecessor Court unanimously upheld Kentucky's previous abortion statute against a variety of constitutional challenges, including the grounds of privacy. The Court further noted that

130

"more than a half of a century of unchallenged existence and application" weighed in favor of the statute's constitutionality. *Id.* at 903.

Instead of considering our predecessor Court's specific constitutional analysis on abortion, the trial court cited *Mitchell v. Commonwealth*, 78 Ky. 204, 210, 1879 WL 6707 (1879), as casting doubt on the constitutionality of the current abortion statutes because a "pre-quickening" abortion was not a crime at common law.[160]  However, the trial court ignored the full text of the *Mitchell* decision, which held:

> In the interest of good morals and for the preservation of society, the law should punish abortions and miscarriages, wilfully produced, at any time during the period of gestation.  *That the child shall be considered in existence from the moment of conception for the protection of its rights of property, and yet not in existence, until four or five months after the inception of its being, to the extent that it is a crime to destroy it, presents an anomaly in the law that ought to be provided against by the law-making department of the government.*  The limit of our duty is to determine what the law is, and not to enact or declare it as it should be.  In the discharge of this duty, and after a patient investigation, we are forced to the conclusion that it never was a punishable offense at common law to produce, with the consent of the mother, an abortion prior to the time when the mother became quick with child.  It was not even murder at common law to take the life of the child at any period of gestation, even in the very act of delivery.

*Id.* (emphasis added).  Far from supporting a constitutional right to abortion, the *Mitchell* Court viewed the common law on abortion as an anomaly susceptible of abrogation by the legislature.  Further, at common law, the quickening distinction was most likely premised on the evidentiary "difficulty of

---

[160]  At common law, quickening referred to "the first felt movement of the fetus in the womb, which usually occurs between the 16th and 18th week of pregnancy." *Dobbs*, 142 S.Ct. at 2249.

131

proving that a pre-quickening fetus was alive." *Dobbs*, 142 S.Ct. at 2251.

There is "no common-law case or authority . . . that remotely suggests a

positive *right* to procure an abortion at any stage of pregnancy." *Dobbs*, 142

S.Ct. at 2251. Moreover, the viability, or even the legal personhood, of a fetus

is irrelevant to the question of whether a legislature possesses the

constitutional authority to prohibit abortion. John Hart Ely, *The Wages of

Crying Wolf: A Comment on Roe v. Wade*, 82 Yale L.J. 920, 926 (1973).

Professor Ely explained:

> For it has never been held or even asserted [until *Roe*] that the
> state interest needed to justify forcing a person to refrain from an
> activity, *whether or not that activity is constitutionally protected*,
> must implicate either the life or the constitutional rights of another
> person. Dogs are not "persons in the whole sense" nor have they
> constitutional rights, but that does not mean the state cannot
> prohibit killing them: It does not even mean the state cannot
> prohibit killing them in the exercise of the First Amendment right
> of political protest.

*Id.* It has further been noted modern adherence to the viability distinction

occurred "outside the ordinary course of litigation, is and always has been

completely unreasoned, and fails to take account of state interests since

recognized as legitimate." *Dobbs*, 142 S.Ct. at 2312 (Roberts, C.J., concurring).

The Kentucky precedent identified by the trial court does not support an

implied constitutional right to abortion. Therefore, the trial court's reliance on

*Wasson* and *Mitchell* to cast doubt on the constitutionality of the abortion bans

was misplaced and an abuse of discretion.

In Counts 3 and 4 of the complaint, Appellees asserted the trigger ban

violated the nondelegation provisions contained in Sections 27, 28, 29, and 60

of the Kentucky Constitution. The trial court, however, failed to apply the appropriate legal standard to support its conclusion that there was a substantial question on the merits of whether the trigger ban constituted an unconstitutional delegation of legislative authority. The trial court cited *Diemer v. Commonwealth, Transportation Cabinet, Dept. of Highways*, 786 S.W.2d 861, 865 (Ky. 1990), for the general proposition that the General Assembly cannot delegate any portion of its legislative power to another authority. However, the trial court failed to apply the proper analysis to distinguish between permissible and non-permissible delegations.

This Court has explained the analytical framework for non-delegation challenges as follows:

> [W]e have upheld the principle that the General Assembly cannot delegate any portion of the legislative function to another authority. The legislative scheme must be essentially complete on its face, leaving to regulatory authority administrative rather than policy decisions. The "delegation of discretion is not unlawful" only "if sufficient standards controlling the exercise of that discretion are found in the act."

*Id.* (citation omitted). This Court has further recognized the decisions of our sister states and the federal courts may be properly considered as persuasive authority in construing the extent of the separation of powers as provided by Sections 27 and 28 of the Kentucky Constitution. *Legislative Rsch. Com'n By and Through Prather v. Brown*, 664 S.W.2d 907, 914 (Ky. 1984).

The trigger ban appears to be a variety of contingent legislation, which are generally upheld in the face of non-delegation challenges. The United States Supreme Court has explained:

133

> Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be affected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the Legislature on the expression of the voters of a certain district.

*Hampton Co v. United States*, 276 U.S. 394, 407 (1928). The Supreme Court distinguished between "the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law." *Id.* (quoting *Cincinnati, Wilmington & Zanesville Railroad Co. v. Commissioners*, 1 Ohio St. 77, 88 (1852)). In other words, a delegation of power to make the law is vulnerable to constitutional challenge while "no valid objection can be made" to a delegation of discretion concerning the execution of the law. *Id.* The views of our sister states on this issue are largely in accord. The Supreme Court of Washington succinctly expressed the rule that the legislature possesses the constitutional authority to "say definitely when an act shall take effect, or it may fix an indefinite time in the future upon the happening of some event before the act shall take effect." *State v. Storey*, 51 Wash. 630, 632, 99 P. 878 (1909).

Once again, cases cited by the trial court are distinguishable from the circumstances of the present appeal. In *Diemer*, we held it was

134

unconstitutional for the legislature to delegate the power to create the statutory definition of a key term used in a statute. In *Dawson v. Hamilton*, 314 S.W.2d 532, 536 (Ky. 1958), the former Court of Appeals held it was an unconstitutional delegation of power for the General Assembly to adopt, in advance, federal time standards that were yet to be determined by a federal agency.

By contrast, the substantive terms of the trigger ban are complete. By its plain terms, the trigger ban neither adopts the federal law as the law of Kentucky nor does it allow another body to determine for itself the law or public policy of Kentucky. Nor is it plainly evident the legislature abandoned its "continuing duty" to determine "[w]hat conduct shall in the future constitute a crime in Kentucky . . . in view of the then existing conditions when the need for such a statute arises." *Id.* The trigger ban was enacted in 2019 and the statute merely fixes an indeterminate time for the law to take effect. Thus, the trial court abused its discretion by failing to consider the well-established distinction between impermissible delegations involving the power to make law and permissible delegations involving a law's effective date.

In Counts 5 and 6 of the complaint, Appellees asserted the trigger bans were unconstitutionally vague and unintelligible because of insufficient notice and clarity concerning the effective date of the statute. Appellees specifically argued the trigger ban was unconstitutional because it did not specify whether it would become effective on June 24, 2022, when the United States Supreme Court entered the judgment in *Dobbs*, or twenty-five days later on July 19,

135

2022, when the mandate issued. In either case, however, it is now well-past both of those dates and the trigger ban would be in effect in either instance. As previously stated in my analysis regarding first-party standing, the claims of vagueness and unintelligibility are now moot because any ambiguity concerning the effective date of the statute has been resolved by the passage of time. *See Louisville Transit Co. v. Dep't of Motor Transp.*, 286 S.W.2d 536, 538 (Ky. 1956) ("where, pending an appeal, an event occurs which makes a determination of the question unnecessary or which would render the judgment that might be pronounced ineffectual, the appeal should be dismissed."). Moot claims cannot support the issuance of a temporary injunction.

The substantial question analysis under the third and final *Maupin* factor should have been limited to the claims raised by Appellees in their complaint. However, the trial court sua sponte raised additional equal protection and free exercise of religion challenges. It is inappropriate for a trial court to inject unraised constitutional challenges on a motion for temporary injunction. *See Stuart Hall Co.*, 51 F.3d at 791; *Cincinnati Bengals*, 453 F.Supp. at 145. Further, as discussed below, the trial court abused its discretion by improperly analyzing the unraised claims.

In his concurring opinion in *Dobbs*, Chief Justice Roberts warned "of the perils of deciding a question neither presented nor briefed." 142 S.Ct. at 2311 (Roberts, C.J., concurring). Nevertheless, in the present appeal, the trial court attempted to justify its injection of unraised constitutional issues on a motion

for temporary injunction by invoking "the duty of courts to consider all legal aspects when evaluating cases." *See Community Financial Services Bank v. Stamper*, 586 S.W.3d 737, 741 (Ky. 2019). The pertinent rule was aptly described by this Court as follows:

> Ordinarily, this Court confines itself rather closely to deciding only those issues which the parties present. We take the view that counsel and the courts below have sufficiently identified the issues; that we need not redefine the question in the last stage of the litigation. However, we are constrained by no rule of court or constitutional provision to observe this procedure, and on rare occasions, the facts mandate a departure from the normal practice. When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law.

*Mitchell*, 816 S.W.2d at 185. However, the rationale set forth by the decisions cited by the trial court are not applicable at the temporary injunction stage because all cited decisions involved appellate review from a final judgment.

Further, the present facts do not reveal a fundamental basis for the trial court's decision. On the contrary, the trial court failed to apply the doctrine of constitutional avoidance, which requires courts to refrain from deciding constitutional questions unless absolutely necessary. *Baker v. Fletcher*, 204 S.W.3d 589, 597-98 (Ky. 2006). This doctrine applies to declaratory judgment proceedings just as in any other case. *Id.* Further, in addressing unraised arguments, the trial court bypassed the rule that, on a motion for temporary injunction, the scope of review should be confined to the issues raised by the pleadings. *Devose v. Harrington*, 42 F.3d 470, 471 (8th Cir. 1994). Therefore, the trial court abused its discretion by raising novel constitutional challenges,

137

sua sponte, on a motion for temporary injunction. *See also Stuart Hall Co.*, 51 F.3d at 791.

Moreover, after improperly injecting unraised constitutional issues, the trial court misapplied the legal standards for evaluating equal protection and free exercise claims. Again, my analysis of these issues is limited to the propriety of the temporary injunction and does not, in any way, reflect a final determination on whether the Kentucky Constitution implies a right to abortion.

Regarding the trial court's equal protection analysis, while the trial court correctly noted the right of equal protection under the Kentucky Constitution is co-extensive with the United States Constitution, the trial court completely ignored the reasoning of the former Court of Appeals in *Sasaki*, which rejected an equal protection challenge to the constitutionality of Kentucky's former abortion statute. *Sasaki*, 485 S.W.2d at 903. The trial court also ignored applicable precedent of the United States Supreme Court, which rejected the contention that the regulation of abortion constitutes invidious discrimination against women on the basis of sex. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273-74 (1993). The Supreme Court properly framed the issue of whether abortion restrictions constitute discrimination on the basis of sex as follows:

> "While it is true," we said, "that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification." . . . "'Discriminatory purpose,'" . . . "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part

138

'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Id.* at 271-72. Governmental disfavor of abortion is simply "not *ipso facto* sex discrimination." *Id.* at 273. The Supreme Court further recognized:

> Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both sides of the issue.

*Id.* at 270. Because the trial court failed to apply the appropriate legal standard and failed to consider relevant precedent, the trial court abused its discretion by determining a substantial question existed on equal protection grounds.

Finally, regarding the claims raised sua sponte based on free exercise of religion and the anti-establishment of religion, the trial court erroneously concluded the Kentucky Constitution provides greater protection than the Federal Constitution. On the contrary, this Court has directly held that the free exercise clause of the Kentucky Constitution is co-extensive with the free exercise clause of the United States Constitution. *Gingerich v. Commonwealth,* 382 S.W.3d 835, 839 (Ky. 2012). If statutes providing for the public health are generally applicable and only incidental to the practice of religion, then they "are properly reviewed for a rational basis under the Kentucky Constitution, as they are under the federal constitution." *Id.* at 844.

The United States Supreme Court has clearly rejected an establishment challenge to federal regulations prohibiting the funding of abortion because

such regulations were "as much a reflection of 'traditionalist' values towards abortion, as it is an embodiment of the views of any particular religion." *Harris*, 448 U.S. at 319. The Supreme Court reasoned, "it does not follow that a statute violates the Establishment Clause because it 'happens to coincide or harmonize with the tenets of some or all religions.'" *Id.* The Supreme Court further cogitated, "[t]hat the Judeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny." *Id.* Additionally, the trial court erroneously ignored or overlooked our predecessor Court's wholesale rejection of an establishment challenge to Kentucky's former abortion statute, wherein it clearly stated:

> It is asserted that the sole justification for abortion statutes is that there is something human to protect. However, it is suggested that the determination of what is human—that is then the embryo or fetus becomes human—is in essence a theological question not to be resolved by the State. For the State to assume that the embryo is human is, it is claimed, tantamount to an unconstitutional establishment of religion.
>
> > This argument is simply not of constitutional proportions. It may be that the precise determination of when the embryo or fetus becomes a human life in being, is . . . a question beyond judicial competence, however, we believe that no such determination is essential for a constitutional justification of the statute. The State is certainly competent to recognize that the embryo or fetus is potential human life, and it is the State's compelling interest in potential human life that justifies the statute.

*Sasaki*, 485 S.W.2d at 903 (internal quotation omitted). Therefore, the trial court again abused its discretion by failing to apply the appropriate legal

140

standards relative to free exercise and establishment challenges it raised sua sponte.

## E. CONCLUSION

In conclusion, novel and controversial constitutional issues must be timely, intentionally, and reasonably decided by courts in the proper case and in the proper course. Judicial review must be consistently exercised in accordance with authentic and unwavering legal precedent and procedural rules, which serve as "lights and buoys to mark the channels of safe passage and assure an expeditious voyage to the right destination." *Brown v. Commonwealth*, 551 S.W.2d 557, 559 (Ky. 1977). Not even oscillating perceptions of urgency attached to a particular constitutional question justify the abandonment of ancient and authoritative legal principles. This Court described the primacy of procedural rules as follows:

> Substantive rights, even of constitutional magnitude, do not transcend procedural rules, because without such rules those rights would smother in chaos and could not survive. There is a simple and easy procedural avenue for the enforcement and protection of every right and principle of substantive law at an appropriate time and point during the course of any litigation, civil or criminal. That is not to say that form may be exalted over substance, because procedural requirements generally do not exist for the mere sake of form and style.

*Id.* Rules of jurisdiction, construction, and procedure do not exist to thwart the administration of justice. On the contrary, these bedrock principles promote stability in the law and the integrity of judicial decision-making. *See Ready v. Jamison*, 705 S.W.2d 479, 482 (Ky. 1986) (Vance, J., dissenting) ("there is no

141

more important principle in law than the principle that rules of law should be uniformly applied.").

Had the trial court simply applied this Court's precedents on standing and otherwise enforced the plain terms of CR 65.04 by requiring Appellees to demonstrate a clear violation of their personal rights, the inquiry should have been ended and the complaint dismissed. Instead, because the question of whether the right to abortion exists by implication under the Kentucky Constitution remains to be judicially determined, the trial court ill-advisedly resorted to policy arguments, novel and unraised constitutional theories, erroneous legal analysis, and raw judicial power to circumvent the otherwise legitimate exercise of the General Assembly's co-equal constitutional authority. In doing so, the trial court abused its discretion because the issuance of the temporary injunction was unsupported by sound legal principles, and as a result, the temporary injunction must be vacated, and this action must be dismissed for lack of standing.

I do not discount the potential impacts of my decision. However, these legitimate concerns cannot be allowed to alter my view of the applicable law, and once more I echo the words of my predecessor, Justice Vance, who said:

> I firmly believe that an appellate court should adhere to long-established precedent unless there is some urgent or compelling reason to depart therefrom which destroys or completely overshadows the reason behind the precedent.

*Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 179 (Ky. 1989) (Vance, J., dissenting). The fair and consistent application of the law requires judges to exercise humility and discipline, otherwise, "the law becomes subject to

142

personal preferences and hence shrouded in doubt." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 262 (2012). Justice Brandeis wisely articulated the quintessential principle that I believe this Court would have done well to follow today:

> The fact that it would be convenient for the parties and the public to have promptly decided whether the legislation assailed is valid, cannot justify a departure from these settled rules of . . . law and established principles of equity practice. On the contrary, the fact that such is the nature of the enquiry proposed should deepen the reluctance of courts to entertain the . . . suit. 'It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility.'

*Ashwander*, 297 U.S. at 345 (Brandeis, J., concurring).

Application of well-established Kentucky precedent compels dismissal of the complaint without regard to the merits of the temporary injunction or the underlying constitutional challenge. Because Appellees have failed to establish either first-party or third-party standing for each of their claims, the entire case should be dismissed without prejudice.

***

THOMPSON, J., CONCURRING IN PART, DISSENTING IN PART: I concur in the majority opinion that first party standing was established for the abortion providers and dissent from its conclusion that they lacked third party standing. I believe we should err on the side of finding standing when at all possible, so that parties can gain needed review.

Accordingly, I urge the trial court to fully exercise its authority on remand by freely allowing intervention by all interested parties so that first party standing may be established for all issues. In this manner, review of both bans can take place. I also urge the trial court to engage in an expedited process to move this case forward.

Once a full evidentiary process has concluded and the trial court has made a decision on the merits, the appealing parties should seek immediate transfer to this Court as this matter will then be ripe for us to engage in a complete review. It is frustrating that we cannot reach the ultimate issues at this juncture, but in light of the current posture of the case, we must return the matter to the trial court to resolve expeditiously. We can then engage in a full review of the constitutionality of these statutes, as soon as reasonably possible.

***

COUNSEL FOR DANIEL CAMERON,
IN HIS CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF KENTUCKY:

Courtney Elizabeth Albini
Assistant Attorney General

Daniel John Grabowski
Assistant Attorney General

Harrison Gray Kilgore
Assistant Attorney General

Matthew Franklin Kuhn
Assistant Attorney General

Alexander Y. Magera
Assistant Attorney General

Michael Robert Wajda
Assistant Attorney General


COUNSEL FOR EMW WOMEN'S SURGICAL CENTER,
P.S.C., ON BEHALF OF ITSELF, ITS STAFF AND
ITS PATIENTS:

Michele Diane Henry
Craig Henry, PLC

Brigitte Amiri
American Civil Liberties Union

Carrie Flaxman
Planned Parenthood Federation of America

Heather Lynn Gatnarek
ACLU of Kentucky

Leah Godesky
O'Melveny & Myers, LLP

Chelsea Tejada
American Civil Liberties Union

Kendall Turner
O'Melveny & Myers, LLP


COUNSEL FOR ERIC FRIEDLANDER, IN HIS
OFFICIAL CAPACITY AS SECETARY OF
KENTUCKY'S CABINET FOR HEALTH AND
FAMILY SERVICES:

Wesley Warden Duke
CHFS Office of Legal Services


COUNSEL FOR ERNST MARSHALL, MD, ON
BEHALF OF HIMSELF AND HIS PATIENTS:

Michele Diane Henry
Craig Henry, PLC

Brigitte Amiri
American Civil Liberties Union

Carrie Flaxman
Planned Parenthood Federation of America

Heather Lynn Gatnarek
ACLU of Kentucky

Leah Godesky
O'Melveny & Myers, LLP

Chelsea Tejada
American Civil Liberties Union

Kendall Turner
O'Melveny & Myers, LLP


COUNSEL FOR PLANNED PARENTHOOD GREAT
NORTHWEST, HAWAI'I, ALASKA, INDIANA AND
KENTUCKY, INC., ON BEHALF OF ITSELF, ITS
STAFF, AND ITS PATIENTS:

Michele Diane Henry
Craig Henry, PLC

COUNSEL FOR MICHAEL S. RODMAN, IN
HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR
OF THE KENTUCKY BOARD OF MEDICAL LICENSURE:

Leanne Kittrell Diakov
Assistant General Counsel


COUNSEL FOR THOMAS B. WINE, IN HIS OFFICIAL
CAPACITY AS COMMONWEALTH'S ATTORNEY
FOR THE 30TH JUDICIAL CIRCUIT OF KENTUCKY:

Jason Bradley Moore

Thomas Benedict Wine



COUNSEL FOR ALEPH, ALLIANCE FOR
JEWIS RENEWAL, AMEINU, ANTI-DEFAMATION
LEAGUE (ADL), AUBURN SEMINARY, CATHOLICS
FOR CHOICE, HADASSAH, THE WOMEN'S ZIONEST
ORGANIZATION OF AMERICA, INC., JEWISH COUNCIL
FOR PUBLIC AFFAIRS, JEWISH EMERGENT NETWORK,
JEWISH ORTHODOX FEMINST ALLIANCE,
JEWISH WOMEN INTERNATIONAL (JWI), JEWS FOR A
SECULAR DEMOCRACY; KARAMAH, KENTUCKY
RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE,
KESHET, METROPOLITAN COMMUNITY CHURCHES,
MUSLIMS FOR PROGRESSIVE VALUES, MUSLIN WOMEN
LAWYERS FOR HUMAN RIGHTS, NATIONAL COUNCIL OF
JEWISH WOMEN, RABBINICAL ASSEMBLY,
RECONSTRUCTIONIST RABBINICAL ASSOCATION,
RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE (RCRC),
SACRED (SPIRITUAL ALLIANCE OF COMMUNITIES FOR
REPRODCUTIVE DIGNITY), SOCIETY FOR HUMANISTIC JUDAISM,
T'RUAH, THE FELLOWSHIP OF AFFIRMING MINISTRIES,
THE RABBINIC CALL FOR HUMAN RIGHTS, THE SHALOM CENTER,
WOMAN'S RABBINIC NETWORK, WOMEN OF REFORM JUDAISM;
WOMEN'S ALLIANCE FOR THEOLOGY, ETHICS, AND
RITUAL(WATER), AND ZIONESS; AMICUS BRIEF:

Kevin Crosby Burke
Burke Neal PLLC

Eugene Martin Gelernter
Patterson, Belknap, Webb & Tyler, LLP

Hilarie M. Meyers
Patterson, Belknap, Webb & Tyler, LLP

Jamie Kristin Neal
Burke Neal PLLC

Elana M. Stern
Patterson, Belknap, Webb & Tyler, LLP


COUNSEL FOR AMERICAN ACADEMY OF
FAMILY PHYSICIANS, AMERICAN COLLEGE OF
OBSTETRICIANS AND GYNOCOLOGISTS,
AMERICAN COLLEGE OF PHYSICIANS, AND
AMERICAN MEDICAL ASSOCIATION AMICUS BRIEF:

Michael Patrick Abate
Kaplan Johnson Abate & Bird LLP

COUNSEL FOR AMERICAN CENTER FOR
LAW AND JUSTICE, AMICUS BRIEF:

Frances James Manion

COUNSEL FOR BSIDEU FOR LIFE PREGNANCY &
LIFE SKILLS and PREGNANCY HELP CENTER MEDICAL
CLINIC; AMICUS BRIEF:

John Nathanael Billings
Billings Law Firm, PLLC


COUNSEL FOR DEMOCRATS FOR LIFE OF
AMERICA:

Benjamin Hachten
Oldfather Law Firm

COUNSEL FOR FREDERICK DOUGLASS FOUNDATION:

Anthony Charles Donahue
Donahue Law Group PSC

COUNSEL FOR HEARTBEAT INTERNATIONAL, INC.:

Matthew Daniel Doane
Doane & Elliott PSC


COUNSEL FOR KENTUCKY RIGHT TO LIFE ASSOCIATION:

Thomas Bernard Bruns
Bruns Connell Vollmar & Armstrong

Christopher David Wiest


COUNSEL FOR MAUREEN. L. CONDIC, PH.D. AND THE
CHARLOTTE LOZIER INSTITUTE:

Bryan Howard Beauman
Sturgill, Turner, Barker & Moloney, PLLC

Scott D. Goodwin
Schaerr, Jaffe LLP

Gene C. Schaerr
Schaerr, Jaffe LLP

Christina M. Squiers
Schaerr, Jaffe LLP


COUNSEL FOR NATIONAL HISPANIC CHRISTIAN
LEADERSHIP CONFERENCE:

Anthony Charles Donahue
Donahue Law Group PSC



COUNSEL FOR REPRESENTATIVE NANCY TATE AND
SENATOR ROBBY MILLS, IN THEIR OFFCIAL CAPACITIES
AS CO-CHAIRS OF THE KENTUCKY GENERAL ASSEMBLY
PRO-LIFE CAUCUS:

Jean Winfield Bird

David Earl Fleenor

149

COUNSEL FOR SIXTEEN RELIGIOUS AND CIVIL-RIGHTS ORGANZIATIONS:

John Saoirse Friend
Friend Law, PSC

Richard B. Katskee
Americans United for Separation of Church and State

Kenneth D. Upton


COUNSEL FOR SOCIETY FOR MATERNAL-FETAL MEDICINE:

Michael Patrick Abate
Kaplan Johnson Abate & Bird LLP


COUNSEL FOR THE FAMILY FOUNDATION:

John Nathanael Billings

Christopher E. Mills
Spero Law LLC


COUNSEL FOR THE PROFILE CENTER AT ST. THOMAS MORE UNIVERSITY (MN):

Teresa S. Collett

John David Hershberger
Hershberger Law Office